George MANDEL, Plaintiff–Appellee,

v.

John DOE (name unknown, an Escambia County Prison employee), et al., Defendants,

Escambia County, Florida, Defendant–Appellant.

No. 88–3557.

United States Court of Appeals, Eleventh Circuit.

Nov. 17, 1989.

As Amended Dec. 12, 1989.

Julius F. Parker, Jr., Parker, Skelding, McVoy & Labasky, Tallahassee, Fla., for defendant-appellant.

Daniel M. Soloway, James F. McKenzie, McKenzie & Milisap, P.A., Pensacola, Fla., for plaintiff-appellee.

Before VANCE and ANDERSON, Circuit Judges, and ATKINS *, Senior District Judge.

ANDERSON, Circuit Judge:

Appellee George Mandel brought this § 1983 action against Escambia County ("County"), contending that he had been injured by a physician assistant's deliberate indifference to his serious medical needs during his tenure as an inmate at a county road prison. The district court entered judgment for Mandel on a jury verdict and damage award of $500,000. The County appeals, arguing that the district court erred in directing a verdict for plaintiff on the issue of municipal liability and in deny-

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

ing the County's directed verdict motions as to that question and deliberate indifference. We conclude that the district court's rulings on the directed verdict motions were correct. We thus affirm the judgment of the district court.

## I. FACTS

In October 1981, Escambia County initiated a program to provide medical care to inmates at its road prison, County Road Camp No. 5, in Cantonment, Florida. As provided in a Memorandum of Understanding between the County and the County Health Department, a physician's assistant was to be located at the road prison to provide medical care to the inmates. Pursuant to this memorandum, physician's assistant Richard Hatfield was placed at the prison to provide medical care. Although it was originally contemplated that the physician's assistant would be supervised by a medical doctor, a custom and practice developed that Hatfield was subject to no supervision or review at all.

George Mandel was lawfully incarcerated at the road prison from June 1 to September 13, 1982. On July 1, 1982, Mandel jumped off the bed of a work crew pick-up truck, landed on his left leg and immediately felt a sharp pain in his left leg and hip.

Two days later, on July 3, 1982, Mandel sought treatment for his injury by filing the required medical request form with the physician's assistant, Richard Hatfield.[1] Hatfield did not see Mandel until July 18. At that time Mandel told Hatfield that something "real bad" was wrong with his leg and requested that an X–ray be performed. Hatfield failed to perform an X–ray or to provide any other treatment on this first visit.[2] Mandel filed with Hatfield another written request for treatment on July 19. He was not examined by Hatfield following this request.

On July 20, as Mandel was waiting at the road prison to be called to work, his left leg collapsed under him. A road prison guard,

Captain Mike Holland, witnessed this event. Upon learning of Mandel's prior injury and his unsuccessful attempts to secure treatment, the guard told Mandel to submit another medical request form, and that he would ensure Mandel was seen by the physician's assistant. That day Mandel filed a third written request for treatment in which he stated that it was hard to walk because every step hurt.

On July 23, Hatfield examined Mandel. Mandel, who entered Hatfield's office dragging his left leg, informed Hatfield that he could not walk on his left leg or put any pressure on the left side of his body. Hatfield diagnosed Mandel's problem as inflammation of the bone and prescribed Motrin and five days of bed rest. Mandel asked to see a doctor or to be sent to a hospital to have X-rays performed. Hatfield refused both requests, saying that he was a doctor.

On July 28, Hatfield visited Mandel in the large dormitory room where he had been resting. Mandel complained that his leg was worsening—that he could barely stand on it—and again requested an X-ray. Hatfield did not examine Mandel, but ordered that he be placed in an isolated cell six feet by eight feet, with no sink or toilet. No explanation was offered for this transfer. After he was placed in the cell, Mandel's condition continued to deteriorate to the point where he could walk only by holding onto something or trying to skip so as not to place any weight on the affected leg.

Hatfield examined Mandel on August 2, and diagnosed his condition as muscle inflammation. Once again Mandel asked to be sent to a hospital for X-rays, and his request was again denied on the grounds that Hatfield was a doctor. Hatfield gave Mandel aspirin and asked whether he wanted to return to work. To avoid having to return to his six-by-eight cell, Mandel responded affirmatively and was released to work.

1. Mandel requested treatment both for his leg injury and for an unrelated skin rash condition.

2. Mandel was given some cream for his skin rash.

From the time they were notified of his injury a day or two after it occurred, Mandel's parents visited him at the road prison on a weekly basis. Mandel's mother kept apprised of his condition through Mandel, other inmates, guards and her own observations.[3] Within two weeks of the injury, Mrs. Mandel called Hatfield, under the assumption that he was a doctor, to ask about her son's condition and to request that he be taken to an emergency room to have X-rays taken. Hatfield said it was not necessary to take X-rays.

The following week, after learning that Hatfield was not a doctor, Mrs. Mandel drove to the prison to ask that her son be taken to a private doctor or an emergency room, and offered to pay for such treatment. At a meeting with Hatfield and prison superintendent Elliott, both Elliott and Hatfield laughed in response to Mrs. Mandel's request, and Elliott asked, "Do you always run interference for your son?" R8:244.[4]

Shortly after that meeting, on August 3, Hatfield again examined Mandel. Hatfield observed that Mandel was virtually unable to walk, but again refused Mandel's request for X-rays, commenting that his mother was offering "interference" for him. Hatfield gave Mandel a muscle relaxant, and placed him back in the six-by-eight cell. Mandel took the prescribed muscle relaxant and stayed in bed, but experienced no improvement. Mandel continued to complain of his condition to Hatfield and to request additional treatment, but was never again examined by him.

After her disappointing meeting with Hatfield and Elliott, Mrs. Mandel and her husband made an appointment with Kenneth Kelson, Chairman of the Board of Commissioners for Escambia County. At that meeting Mr. and Mrs. Mandel explained the circumstances of Mandel's injury and Hatfield's refusal to send Mandel to be examined by a doctor. Chairman Kelson told the Mandels that he would try to get their son out of the six-by-eight cell and to secure some treatment for his injury.

Following that meeting, Chairman Kelson sent the County Administrator, Rodney Kendig, to the road prison. Kendig was successful in securing Mandel's immediate release from the cell back into the general population. However, Mandel did not receive any medical care following Kendig's intervention—no X-rays were performed, and he was not brought to see a doctor.

In a subsequent conversation with Mandel's father, Kelson said "that as far as doing anything about the medical aspect of the case that . . . he had no authority whatsoever to butt into the internal affairs or any of the workings of the county government and specifically the county road camp." R8:264–65.[5]

On August 10, Mandel returned to work with the authorization of Hatfield. Mandel's road crew captain gave him light work to perform, such as raking dirt. Mandel continued to request medical care from Hatfield and other personnel at the road prison, and Hatfield told Mandel that he would never receive an X-ray for his leg. Mrs. Mandel also repeatedly asked Hatfield that her son be taken to an emergency room or seen by a private physician, at her expense. Her requests were all denied.

Mandel was released from the county road prison in September 1982, upon com-

---

**3.** Mrs. Mandel described her visit the first Sunday after his injury as follows:

Well, we had to sit on a thing like a ramp or a porch on the side of the building, and as he come out the door where they search them as they came out, well he was just dragging his leg and he couldn't hardly walk, so I got up and went and he held around me and walked to the place where we were seated.
R8:241.

**4.** Mrs. Mandel testified that the meeting ended when she confronted Hatfield with her knowledge that he was not a physician:

And I said, "Another thing, Mr. Hatfield, you're not a doctor." And he said, "How do you know that, Mrs. Mandel?" I said, "I've been told and I don't care to tell you who told me." And so they were just laughing, so I just got up and left.
R8:244.

**5.** According to Henry Mandel's testimony, Kelson specifically said that the internal affairs into which he would not interfere were medical affairs.

pletion of his sentence. At the time of his release, Mandel was unable to walk.

Shortly after his release Mandel was examined by Dr. Leo Flynn, a Board-certified orthopedic surgeon. Dr. Flynn took X-rays and determined that Mandel had sustained a fracture or crack in the round part of the hip joint when he jumped off the truck. According to Dr. Flynn, the failure to perform surgery following the fracture caused a collapse of the roundness of the bone and made necessary a complete prosthetic hip joint replacement, including both the ball and socket.[6]

Mandel filed this action pursuant to 42 U.S.C. § 1983,[7] alleging that he had suffered permanent physical impairment as a result of the deliberate indifference of the County officials in violation of the Eighth Amendment. Following the dismissal by stipulation of all individual defendants, the sole defendant at trial was Escambia County. At the close of plaintiff's case, the County moved for a directed verdict on the issues of deliberate indifference and municipal liability. The motion was denied. At the close of all the evidence, the district court denied another motion for directed verdict by the County and granted, over defendant's objection, Mandel's motion for directed verdict on the question of *Monell* liability.[8] The jury returned a verdict in favor of Mandel in the amount of $500,000. Following entry of judgment, the court denied defendant's motions for judgment notwithstanding the verdict or in the alternative for a new trial. The County timely appealed from the final judgment.

6. Due to financial limitations, Mandel had not yet secured the necessary hip joint replacement at the time of trial.

7. 42 U.S.C. § 1983 provides in pertinent part:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

## II.  DELIBERATE INDIFFERENCE

The County argues that the district court erred in denying its motion for a directed verdict and for judgment notwithstanding the verdict on the question of whether Hatfield's treatment constituted deliberate indifference to Mandel's serious medical needs. The County contends that the evidence, taken in the light most favorable to the plaintiff, shows no more than a denial of Mandel's requests for an X-ray. Therefore, the County maintains that the deliberate indifference issue in this case is controlled by *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), which found that the failure to order an X-ray did not by itself amount to deliberate indifference. The record in this case, however, is replete with evidence of serious medical need, grossly deficient treatment and callous indifference. Accordingly, we conclude that the district court was correct in denying the County's motion for directed verdict on this issue.

■■■ The Supreme Court has held that the Eighth Amendment proscription against cruel and unusual punishment[9] does not permit prison personnel to subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. at 106, 97 S.Ct. at 292. In articulating the scope of this right, the Court has warned that not "every claim by a prisoner that he has not received adequate medical treatment states a [constitutional] violation." 429 U.S. at 105, 97 S.Ct. at 291. Mere negligence or medical mal-

8. In *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court overruled *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and concluded that municipal governments may, under certain circumstances, be held liable under 42 U.S.C. § 1983.

9. The Eighth Amendment provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., Amend. VIII. The Eighth Amendment applies to the states through the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

practice is not sufficient. *See West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 2255 n. 8, 101 L.Ed.2d 40 (1988); *Estelle*, 429 U.S. at 105–06, 97 S.Ct. at 292. However, "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle*, 429 U.S. at 103, 97 S.Ct. at 290. Thus the state has a constitutional obligation to provide adequate medical care to those whom it has incarcerated. *Id.* *See also West v. Atkins*, 487 U.S. at ——, 108 S.Ct. at 2258. Accordingly, "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 105, 97 S.Ct. at 291.

■ Our analysis has two components. First, we must evaluate whether there was evidence of a serious medical need; if so, we must then consider whether Hatfield's response to that need amounted to deliberate indifference. *See West v. Keve*, 571 F.2d 158, 161 (3rd Cir.1978) ("deliberate indifference" standard is "two-pronged. It requires deliberate indifference on the part of prison officials and it requires the prisoner's medical needs to be serious").

■ On appeal the County does not dispute the severity of Mandel's medical needs. Moreover, it is clear upon examination of the record that Mandel had serious medical needs. During Mandel's first visit with Hatfield, on July 18, Mandel related that something "real bad" was wrong with his leg. Two days later, a road prison guard witnessed Mandel's leg collapse under him, which prompted the guard to recommend the submission of another written request for treatment. Mandel's third written request stated that he found it hard to walk, as every step hurt. On July 23, Hatfield examined Mandel and observed him dragging his leg behind him as he entered the office. On July 28, when Hatfield visited Mandel, Mandel complained that his leg was worsening, as he could barely stand on it. At another examination, Hatfield observed that Mandel was virtually unable to walk, and that Mandel screamed in pain when Hatfield moved his injured leg. Mandel continued to complain to Hatfield of his deteriorating condition until his release. This evidence supports the jury's conclusion that Mandel had established a serious need for medical care after his injury. *See Washington v. Dugger*, 860 F.2d 1018, 1021 (11th Cir.1988) (medical needs of inmates need not be considered "life threatening" to be considered serious under *Estelle* ). *See also Aldridge v. Montgomery*, 753 F.2d 970, 973 (11th Cir.1985).

■ Absent evidence of " 'conscious or callous indifference to a prisoner's rights,' " the mere fact of an inmate's injury is insufficient to state a claim of deliberate indifference. *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir.1986), quoting *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir.1982), *cert. denied*, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). We now turn to a consideration of Hatfield's response to Mandel's serious medical needs.

This court has consistently held that knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference. *See Carswell v. Bay County*, 854 F.2d 454, 457 (11th Cir.1988); *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 704 (11th Cir. 1985); *Fielder v. Bosshard*, 590 F.2d 105, 108 (5th Cir.1979). In many respects, the facts of this case parallel the finding of deliberate indifference upheld in *Carswell*. There, an inmate in a county jail suffered from a skin rash, constipation and significant weight loss. This court held that the fact that two jail personnel told the physician's assistant of the inmate's serious situation established the assistant's knowledge of the inmate's need for medical attention. Because the evidence established that the assistant failed to advise the supervising physician of the inmate's condition and that the jail administrator failed to respond to specific requests for the attention of a doctor made by the inmate and a public defender, this court concluded that a reasonable jury could conclude that the failure to provide medical care constituted deliberate indifference.

Similarly, in the instant case, the fact that a prison guard saw Mandel collapse and intervened on his behalf to secure an appointment with Hatfield, coupled with Hatfield's observations of Mandel's pain and his dragging of the affected leg, conclusively establish Hatfield's knowledge of the need for medical care.[10] In spite of this knowledge, however, Hatfield never took the appropriate measures to ensure that Mandel received adequate treatment.

Indeed, the evidence here is much more demonstrative of deliberate indifference than that shown in *Carswell*. The evidence indicates that Hatfield exhibited complete indifference to Mandel's worsening condition. Hatfield callously and cavalierly ignored repeated indications from Mandel and his parents that the patient's condition was far more serious than his two different diagnoses—bone inflammation and muscle inflammation—suggested. Mandel had to wait fifteen days after submitting his first request for treatment before even seeing Hatfield. Only after three requests had been filed, twenty days had passed, and a prison guard (who had witnessed Mandel's leg collapse) had intervened on Mandel's behalf, did Hatfield conduct an extensive examination, offer his first diagnosis and prescribe any form of medication and treatment. Hatfield saw Mandel dragging his leg behind him on more than one occasion, and he conducted an examination in which he watched Mandel scream in pain from the movement of his injured leg. In response to mounting evidence that the injured leg was not improving, and, indeed, was deteriorating, Hatfield refused to allow Mandel to see a doctor or to go to a hospital. Hatfield refused to perform an X-ray of the injured leg and stated that he would never order an X-ray. During the course of treatment Hatfield twice ordered that Mandel be removed from the general population and placed in an isolated six-by-eight cell

with no water or toilet facilities. Finally, when Mandel's mother, concerned that her son was not receiving even rudimentary care, asked that her son be seen by a doctor, Hatfield laughed at her and reiterated his refusal.[11]

■ Thus, the evidence clearly established that despite repeated requests by both Mandel and his parents directed at Hatfield and prison superintendent Elliott, Hatfield never apprised his superior, Dr. Putnam, of Mandel's situation, obtained an X-ray of Mandel's leg, or had Mandel either examined by a doctor or taken to a hospital. When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference. *See Ancata v. Prison Health Services, Inc.*, 769 F.2d at 704 (medical care of pre-trial detainee which is so cursory as to amount to no treatment at all may violate the Fourteenth Amendment); *West v. Keve*, 571 F.2d at 162 (although inmate who alleged post-operative pain in his leg had been provided with aspirin, "this may not constitute adequate medical care").

In addition, there exists evidence that Hatfield had previously exhibited deliberate indifference in carrying out his responsibilities as physician's assistant. In January or February, 1982, shortly before Mandel's arrival at the road prison, Hatfield bragged to another County physician's assistant, James Grider, Jr., that in order to teach a patient a lesson for forcing him to come out to the prison to render medical care after normal hours, he had restricted a sick inmate to an isolation cell without smoking privileges. Mr. Grider testified that "it bothered him [i.e. Hatfield] that he had to come out there [in order to provide treatment] even though that was the rule that he had set up with the working staff out at the road camp that if any medical

---

**10.** In addition, we note that Mandel's parents' meetings with prison superintendent Elliott and County Commissioners Board Chairman Kelson, at which Mandel's condition was described and

requests for care made, establish knowledge on the part of prison and County officials.

**11.** Prison superintendent Elliott also laughed at Mandel's mother when she requested that her

problems came up he was to be notified."[12] R7:151. Grider brought these incidents to the attention of Dr. Putman, who then went upstairs to report the matter to the director of the County Health Department. Upon coming back downstairs, Dr. Putnam told Grider: "Well, that's the way it is, we'll just have to work with it." R7:152.

Furthermore, evidence was presented that Hatfield had in the past inflicted unnecessary pain on a patient in his care. David Burson, a physician's assistant at the road prison who trained under Hatfield between the summer of 1982 and May, 1983, testified to an incident which occurred in August or September of 1982:

> There was one inmate that came in, had an abscess under his arm ... it was after sick call hours and Mr. Hatfield was a little upset, but he brought him in and he was examining him and he reached up under his arm and squeezed, and that upset me.... I believe that he was causing the inmate unnecessary pain and that he could have made the diagnosis without that.

R8:164.

Finally, Mandel offered expert evidence that the treatment afforded him failed to meet appropriate professional standards. *Cf. Hamm v. Dekalb County*, 774 F.2d 1567, 1575 (11th Cir.1985) (finding no deliberate indifference where inmate was seen by physician and psychiatrist, and where there was no evidence that medical treatment he received fell short of appropriate professional standards), *cert. denied*, 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). Dr. Flynn, Mandel's orthopedic surgeon, testified in a video deposition played before the jury that the delay in properly diagnosing the hip injury deprived Mandel of one treatment option, bone grafting, which might have been pursued had the

injury been timely treated. Flynn testified that, had Mandel been correctly examined and his hip fracture quickly recognized, it might have been possible to treat the fracture prior to the collapse of the ball in the hip joint. According to Flynn, it was probable that the hip ball collapsed gradually in the aftermath of the fracture. As a result, by the time a correct diagnosis of Mandel's injury was conducted after he had left the prison, it was necessary to completely replace the hip joint.[13]

As a physician's assistant, Hatfield could not have been expected to diagnose correctly every medical problem brought to his attention. However, his persistent refusal to order an X-ray, or to refer Mandel to a doctor or a hospital for more experienced and knowledgeable treatment, coupled with his utter lack of concern for the well-being of an inmate with whose care he had been entrusted, constitutes precisely the deliberate indifference not tolerated by the Constitution. Accordingly, we conclude that the district court properly denied the County's motion for directed verdict on the issue of deliberate indifference.

## III. COUNTY LIABILITY—POLICY OR CUSTOM

Having determined that the district court was correct in denying the County's motion for directed verdict as to deliberate indifference, we now proceed to the question of whether that indifference was a product of policy or custom for which the County can be held liable. The County argues that the district court erred both in denying its motion for directed verdict on this issue, and in granting Mandel's directed verdict motion. We address the court's ruling on each motion in turn.

---

son be permitted to see a doctor, and denied the request.

**12.** Mr. Grider also testified that, after his first conversation with Hatfield, he had told two doctors, "'I just do not feel that this gentleman should be working with patients.' He just was indifferent to care." R7:160–61.

**13.** Dr. Flynn declined to opine whether Hatfield's failure to order an X-ray "was because of a lack of knowledge or whether that was because of indifference and I don't feel qualified to make a decision about that in regard to the personality of the physician involved because I don't even know.... The most appropriate thing would have been to get an X-ray." Deposition of Dr. Flynn 32.

## A. *Grant of Plaintiff's Directed Verdict Motion*

■ A local government is liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury...." *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). *See also Geter v. Wille,* 846 F.2d 1352, 1354 (11th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 870, 102 L.Ed.2d 994 (1989). Section 1983 liability may not be premised solely upon a respondeat superior theory—i.e., a county may not be held liable solely by virtue of the employment relationship linking it to the offending employee. Rather, only deprivations undertaken pursuant to governmental "custom" or "policy" may lead to the imposition of governmental liability. "[R]ecovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). *See City of Canton v. Harris,* —— U.S. ——, ——, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989) ("a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue") (emphasis in original).

The County contends that the district court erred in directing a verdict at the close of all the evidence because there was insufficient evidence to establish the existence of a custom or policy which caused the deliberate indifference. According to the County, there was only one incident in the record to support the existence of a governmental policy or custom—Hatfield's deliberate indifference and Chairman Kelson's

statement to Mandel's father that he would not intervene. Relying on *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), the County argues that a single act cannot establish governmental policy or custom for purposes of § 1983, unless the policy itself is unconstitutional. Here, the County asserts, its policy was "to provide medical attention to the inmates of the road prison by stationing a duly licensed physician's assistant at the road camp to work under the supervision of a licensed medical doctor." Brief of Appellant 31. Such a policy can hardly be deemed unconstitutional. Accordingly, the County argues, the one act of Chairman Kelson is insufficient to establish governmental liability.

The County's sole argument at trial and on appeal was premised upon the Supreme Court's decision in *City of Oklahoma City v. Tuttle,* in which a plurality of the Supreme Court held that, in cases involving unconstitutional acts of low-level municipal employees, the plaintiff may prove custom or policy by showing a pattern of unconstitutional acts. The instant case, however, concerns altogether different methods of proving custom or policy: the delegation of final policymaking authority from one official to another and the ratification of a subordinate's actions by a final policymaker. *See Tuttle,* 471 U.S. at 834, 105 S.Ct. at 2441 (Brennan, J., concurring in part and concurring in the judgment) ("there may be many ways of proving the existence of a municipal policy or custom that can cause a deprivation of a constitutional right").[14] Recent Supreme Court decisions have traced the contours of these alternative theories of addressing when a local government may be held liable under § 1983 for a single decision by a government policymaker.

---

14. In *Tuttle,* the widow of a man shot by a police officer sued the city under § 1983, alleging that the city's inadequate training of its police force was responsible for the shooting. The trial court instructed the jury as to two theories of liability, one of which permitted the city to be held liable for the shooting absent any evidence of a municipal training policy other than the shooting itself. The jury found the city liable. The Supreme Court held that, by itself, proof of the single incident of unconstitutional activity by a low-level officer—the use of excessive force—was not sufficient to impose governmental liability under § 1983. *See Tuttle,* 471 U.S. at 823–24, 105 S.Ct. at 2436 (plurality opinion); *id.,* 471 U.S. at 831, 105 S.Ct. at 2440 (Brennan, J., concurring in part and concurring in the judgment).

In *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Court upheld a finding of municipal liability for the violation of plaintiff's Fourth Amendment rights where deputy sheriffs unlawfully entered plaintiff's office on the express instructions of the county prosecutor. Because the county prosecutor "was acting as the final decisionmaker for the county" at the time he ordered the deputy sheriffs to enter the office, the Court concluded the county could be held liable under § 1983. 475 U.S. at 484–85, 106 S.Ct. at 1301. Thus, *Pembaur* stands for the proposition that, under certain circumstances, municipal liability may be imposed for a single decision by a municipal policymaker.[15] 475 U.S. at 480, 106 S.Ct. at 1298.

In *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), the Court sought to clarify the question of "when a decision on a single occasion may be enough to establish an unconstitutional municipal policy." 485 U.S. at 123, 108 S.Ct. at 924 (plurality opinion). The Court in *Praprotnik* held that a municipality could not be held liable for the unconstitutional transfer of a city employee where the officials who arranged for the transfer did not possess final policymaking authority with respect to employment decisions and had not been delegated such authority. *Praprotnik* reaffirmed that "the authority to make municipal policy is necessarily the authority to make *final* policy." 485 U.S. at 127, 108 S.Ct. at 926 (plurality opinion) (emphasis in original). The Court concluded that the mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. Rather, the delegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are not

subject to review. *Praprotnik,* 485 U.S. at 125–28, 108 S.Ct. at 925–26.

Furthermore, the *Praprotnik* plurality made clear that the question of whether an official has final policymaking authority is a question of state law. 485 U.S. at 124, 108 S.Ct. at 924 (plurality opinion). Most important for this case, the *Praprotnik* plurality stated that final policymaking authority could be delegated, and that the delegation issue was a question of state law:

'Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether such official had final policymaking authority is a question of state law.'

*Id.* at 124, 108 S.Ct. at 924 (quoting *Pembaur v. Cincinnati,* 475 U.S. at 483, 106 S.Ct. at 1300 (plurality opinion)).[16]

Just this last term, in *Jett v. Dallas Independent School District,* —— U.S. ——, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), a majority of the Supreme Court adopted the *Praprotnik* plurality's view that identification of the official or final policymaker is a question of state law, to be determined by the trial judge and not by the jury:

[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury. Reviewing the relevant legal materials, including state and local positive law, as well [as] 'custom or usage' having the force of law, the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular con-

**15.** The "ultimate policymaker" theory of municipal liability was not created anew in *Pembaur.* In *Monell,* the Court concluded that municipalities could be held liable only when an injury was inflicted by a government's "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." 436 U.S. at 694, 98 S.Ct. at 2037–38.

**16.** The *Praprotnik* plurality articulated not only a delegation theory of municipal liability, but also one based upon ratification:

If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926.

stitutional or statutory violation at issue. Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue ....

*Jett,* —— U.S. at ——, 109 S.Ct. at 2723 (emphasis in original) (quotation and citation omitted).

Although identification of the policymaker may often involve fact-sensitive inquiries, the Supreme Court has determined as a matter of policy that courts, and not juries, are to make this decision. "Municipalities cannot be expected to predict how courts or juries will assess their 'actual power structures,' and this uncertainty could easily lead to results that would be hard in practice to distinguish from the results of a regime governed by the doctrine of *respondeat superior.* It is one thing to charge a municipality with responsibility for the decisions of officials invested by law, or by a 'custom or usage' having the force of law, with policymaking authority. It would be something else, and something inevitably more capricious, to hold a municipality responsible for every decision that is perceived as 'final' through the lens of a particular factfinder's evaluation of the city's 'actual power structure.' " *Praprotnik,* 485 U.S. at 124 n. 1, 108 S.Ct. at 924 n. 1.

For these reasons, every circuit court of appeals, including this court, that has addressed this issue since *Praprotnik,* has concluded that the identification of the final policymaker is a question of state law for the trial judge, not for the jury. *See Owens v. Fulton County,* 877 F.2d 947, 950–51 (11th Cir.1989); *Parker v. Williams,* 862 F.2d 1471, 1478–81 (11th Cir. 1989). *See also Arnold v. Bd. of Educ. of Escambia County,* 880 F.2d 305, 316 (11th Cir.1989). *Accord Worsham v. City of Pasadena,* 881 F.2d 1336, 1340 (5th Cir.1989); *Praprotnik v. City of St. Louis,* 879 F.2d 1573, 1574 (8th Cir.1989); *Starrett v. Wadley,* 876 F.2d 808, 818–19 (10th Cir.1989); *Zook v. Brown,* 865 F.2d 887, 894–95 (7th Cir.1989).

■ As the above discussions of *Jett, Praprotnik,* and *Pembaur* make clear, municipal liability may attach to a single decision made by a municipal official if that municipal official is the final policymaker for the municipality with respect to the subject matter in question. Under this theory of municipal liability, the first step of the inquiry is to identify those individuals whose decisions represent the official policy of the local governmental unit. *Jett,* —— U.S. at ——, 109 S.Ct. at 2723. As already discussed, this is a question of law to be resolved by the trial court judge. *Id. See Praprotnik,* 485 U.S. at ——, 108 S.Ct. at 924. In making this determination, the court should examine not only the relevant positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law. *Jett,* —— U.S. at ——, 109 S.Ct. at 2723. *See Pembaur,* 475 U.S. at 485, 106 S.Ct. at 1301 (county prosecutor found to be final policymaker based in part on relevant operational practices). *See also Williams v. Butler,* 863 F.2d 1398, 1403 (8th Cir.1988) (in banc) (plurality opinion), *cert. denied,* —— U.S. ——, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989). The court must also ensure that the municipal official possesses the authority and responsibility for establishing *final* policy with respect to the issue in question. *See Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926; *Pembaur,* 475 U.S. at 483–84, 106 S.Ct. at 1300. Only after this determination is made is the second step of the inquiry relevant: Did the challenged decision or act of the official cause the deprivation of the plaintiff's rights? The answer to this question is, of course, for the jury. *See Jett,* —— U.S. at ——, 109 S.Ct. at 2723.

■ In this case, the district court clearly understood the delegation theory of governmental liability at issue as outlined in *Pembaur, Praprotnik* and *Jett* when it held that final policymaking authority with respect to medical decisions at the road prison had been delegated to Hatfield.[17]

---

**17.** The district court also held that the County

had ratified Hatfield's decisions in this case.

As noted above, this issue of whether final policymaking authority was delegated to Hatfield is a question of state law to be decided by the district court, and not to be submitted to the jury. Accordingly, our standard of review is not premised upon whether a reasonable jury could find otherwise; rather, we must independently review the district court's decision on this matter of state law.

We agree with the district court's conclusion that Hatfield was acting as the final policymaker for the County with respect to the medical affairs at the road prison. The County had entered into a Memorandum of Understanding with the health department and had established a policy that medical care for inmates at the road prison would be provided by a physician's assistant. Hatfield was that physician's assistant. Although it was initially contemplated that the physician's assistant would be supervised by a medical doctor, the evidence revealed that a custom and practice developed so that the policy was that Hatfield was authorized to function without any supervision or review at all. The policy was that Hatfield's medical decisions were subject to no supervision or review, except to the extent that Hatfield himself, in his sole and unsupervised discretion, deemed appropriate. We agree with the district court that Hatfield was the sole and final policymaker with respect to medical affairs at the road prison.[18]

■ Of course, we properly accord some deference to the evaluation of the district judge who is familiar with local law, *see National Fire Insurance Co. v. Housing Development Co.*, 827 F.2d 1475, 1480 (11th Cir.1987), and who had before him all of the evidence adduced as to the structure of this local government with respect to medical policymaking at the road prison.[19] Our independent review of this issue of state law leads us to agree with the district court that the County did delegate to Hatfield final policymaking authority with respect to medical affairs at the road prison.[20] Because Hatfield had been delegated the final policymaking authority with respect to medical affairs at the prison, his acts of deliberate indifference can be attributed to the County so as to establish municipal liability. *See Pembaur*, 475 U.S. at 483–84, 106 S.Ct. at 1292 (municipality may be liable under § 1983

The district court's holding that the County had ratified Hatfield's decision was based on the evidence that Kelson, the Chairman of the County Commission and the highest executive officer of the County, was specifically told the details of Hatfield's actions constituting deliberate indifference, that he investigated same, and then acquiesced therein. Since we affirm the district court on the delegation issue, we need not address the ratification issue.

18. The fact of the County's delegation was established by the Memorandum of Understanding, the testimony of Newsome, the business manager for the Health Department, and also by the testimony relating the statements of County Commission Chairman Kelson. The policy that Hatfield's decisionmaking was unsupervised, final and subject to no review was established by the following evidence. Dr. Putnam, who was originally contemplated to supervise Hatfield, testified to this effect. There was also testimony from Grider and Burson that the situation (i.e., that Hatfield was acting as the final policymaker with respect to medical decisions at the road prison) was known to and acquiesced in by the two highest officials of the County Health Department, which in turn had been delegated final authority by the County Commission. Also, County Commission Chairman Kelson, when told of Hatfield's actions constituting deliberate indifference, stated that he had no authority to intervene with respect to such medical affairs.

19. Appellants have not included in the record on appeal all of the relevant evidence; e.g., only limited excerpts are included from the depositions of Dr. Putnam and Hatfield.

20. At trial, the County introduced absolutely no evidence on the delegation issue. More importantly, the County never argued, either in the district court or on appeal, that the district court erroneously concluded that there was a delegation to Hatfield of final policymaking authority. Notwithstanding a clear statement to this effect by the district judge, appellants argued *only* that under *Tuttle*, liability could not attach for an isolated incident. Similarly, on appeal, appellants have argued *only* the *Tuttle* theory and have wholly failed to address the delegation issue and have not asserted that the district court erroneously evaluated the local law and practice relevant to delegation of medical policymaking authority. We conclude that appellants have effectively abandoned the issue, and this conclusion constitutes an alternative holding in this case.

where "a deliberate choice is made from among various alternatives by the official or officials responsible for establishing final policy with respect to subject matter in question.").

**B.** *Denial of Defendant's Directed Verdict Motion*

The County argues that the district court erred, not only in directing a verdict in Mandel's favor on the issue of County liability, i.e., the *Monell* issue, but also in denying the county's own motion for directed verdict on that issue. Logically following our conclusion immediately above that the district court properly directed a verdict for Mandel on this issue, we thus affirm the district court's denial of the county's motion for directed verdict on the issue.

## IV. CONCLUSION

The district court properly denied defendant's motions for directed verdict on the issues of deliberate indifference and *Monell* liability. The district court correctly directed a verdict for Mandel on the *Monell* issue.

Accordingly, the judgment of the district court is AFFIRMED.