Stoney Allan **MERIDETH, Individually and as Administrator of the estate of Jerry Wayne Merideth, deceased, Ricky Pearson Merideth, and Shelia Merideth, as Natural guardian of Dusty Wayne Merideth, a minor, Plaintiffs,**

v.

Perry **GROGAN, Individually and in his Official Capacity as Sheriff of Paulding County, Georgia; Lamar Hunton, Individually and in his Official capacity as Deputy Sheriff of Paulding County, Georgia; John C. Helms, John Walton and H.D. Williams, Individually and in their official capacities as Commissioners of Paulding County; Paulding County, Georgia, and John Does, Deputy Sheriffs of Paulding County, Georgia, as yet unknown, Individually and in their Official capacities as such, Defendants.**

**Civ. A. No. 4:90-cv-255-HLM.**

United States District Court, N.D. Georgia, Rome Division.

April 13, 1992.

Donald Burton Howe, Jr., Howe & Dettmering, Douglasville, GA, Michael N. Weathersby, Evert & Weathersby, Atlanta, GA, for plaintiffs.

Theodore Freeman, Drew Eckl & Farnham, Atlanta, GA, James Glenn Richardson, Vinson Osborne Talley & Richardson, Dallas, GA, for defendants.

## ORDER

HAROLD L. MURPHY, District Judge.

This civil rights case is before the Court on Defendants' Motion for Summary Judgment. The facts comprising this lawsuit depict a tragic tale of suicide. On April 20, 1990, the decedent, Jerry Wayne Merideth ("Decedent"), spent most of the day with his two sons, Plaintiffs Ricky Merideth ("Ricky") and Dusty Merideth ("Dusty"). During the day, the three men rode around town, purchased some beer and eventually decided to go to the local sporting goods store to buy some shells for Decedent's pistol.

After they purchased the shells, the three men drove to a dirt road where Ricky and Decedent practiced shooting the gun at targets. Sometime during this target practice Decedent told Ricky to leave and take his brother with him as Decedent intended to kill himself. Instead, Ricky was able to take the shells away from Decedent and convince his father to accompany him to his grandmother's house. When they arrived at Ricky's grandmother's house, Decedent again tried to get the shells away from Ricky, but he was unsuccessful.

While Decedent was trying to regain the pistol shells, Dusty went inside his grandmother's house and called his mother, Decedent's ex-wife, Shelia Merideth, and explained to her what was going on. Shelia told Dusty to go home. Soon thereafter Ricky called Shelia. As with Dusty, Shelia told Ricky to go home. This time, however, Shelia decided to go to the grandmother's house to talk to Decedent.

Shelia arrived at Ruth Merideth's house and talked to both Decedent and his mother. She then decided to call the Paulding County Sheriff's Department and told them that Decedent was drunk and that he was trying to kill himself and requested that someone from the Sheriff's department come out and investigate.[1]

When the Sheriff's Deputies arrived they found Decedent in the front yard holding a loaded gun in his hand. They disarmed Decedent and put him in custody. Plaintiffs claim that the deputies stated that they were going to take Decedent to the Hospital, while the Deputies claim that Decedent agreed to go to the Paulding County jail first as the hospital would not take him in his intoxicated state.[2] Regardless of what was said, the Deputies handcuffed Merideth, put him in the patrol car and transported him to the Paulding County Jail.

On the way to the County Jail, the deputies informed Sheriff Grogan about the situation. Sheriff Grogan told the deputies to place Merideth in isolation, search and remove any items of danger and keep a fifteen (15) minute watch over him until he was able to be transported to the hospital. While at the jail, Sheriff Grogan's alleged orders were not fully followed.[3]

---

1. Plaintiffs also claim that Shelia Merideth told the dispatcher that Decedent had tried to commit suicide in the past and that Paulding County Deputies had taken him to the hospital on that previous occasion.

2. Plaintiffs have introduced evidence which tends to refute Defendants' statements that the Hospital would not take decedent in his intoxicated state. Plaintiffs filed an objection to certain parts of Deputies Tom Murphy and Mike Hicks's affidavits which relate their knowledge of this alleged hospital policy. Contrary to Plaintiffs' argument, and as Defendants point out, the statements in the affidavit are not hearsay as they are not rendered for proving the existence of the policy, instead, they are introduced to show the deputies belief that such a policy existed. Consequently, Plaintiffs' objections to those portions of the affidavits are without merit.

3. Plaintiffs have introduced testimony that Sheriff Grogan did not give specific instructions as to the care Merideth was to receive while staying in the Paulding County jail.

Deputy Rod Rachel took over the watch of A–Hall, where Merideth was located, at 7:30 p.m. Rachel was told to check on Merideth every 15–20 minutes. Although the other deputies at the jail knew that decedent was in jail because he threatened suicide, Rachel was not told about decedent's suicidal tendencies. Around 9:00 p.m. Rachel began delivering medication to the inmates, so he was unable to check on Decedent for about an hour. At 10:45 p.m. Rachel checked on Decedent and noticed that Decedent was sitting in the shower portion of the cell; however, Rachel did not notice anything unusual. Another jailer, Eddie Stanford, walked by Decedent's cell around 11:00 p.m. and noticed that Decedent was still near the shower area. He rattled the cage and when Decedent did not move he called for Rachel to come to the cell before he entered. When Rachel arrived, both men entered the cell and discovered that Decedent had tied the shower cord to the top of the shower stall and used it to hang himself. Subsequently, the deputies summoned Sheriff Grogan, Jail Administrator Lamar Hunton, and the medical examiner to the jail. Merideth was taken to Paulding County Hospital and pronounced dead at 3:45 a.m.

Plaintiffs filed this lawsuit on October 1, 1990, claiming that Defendants had violated Decedent's Fourth, Eighth and Fourteenth Amendment rights because the deputies had unreasonably seized Decedent and were deliberately indifferent to his known medical needs. Plaintiffs also claim that Defendants had an official policy to deprive Decedent of these same rights. In addition, Plaintiffs have asserted a state wrongful death action against all Defendants.

Defendants argue that Decedent was not seized because he agreed to go with the police and even if he was seized, he was not unreasonably seized. Defendants further contend that they owed no duty to Decedent to prevent him from committing suicide and, consequently, they did not violate any of his constitutional due process rights. As to the state wrongful death claim, Defendants claim that they did not commit any wrongful acts which caused Decedent's death.

As an administrative requirement, the Court notes that Plaintiff dismissed certain parts of this case in their conclusion to their opposition to summary judgment. Plaintiffs have dismissed the Fourth Amendment claim as to the County Commissioners and Lamar Hunton. Furthermore, Plaintiffs have agreed to dismiss their Eighth Amendment claim against all Defendants.

## SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." The moving party bears the heavy burden of demonstrating that no dispute as to any material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir.1991). This burden can be met by "pointing out to the District Court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This initial burden remains with the moving party even when the issue involved is one on which the nonmovant will bear the burden of proof at trial. *Russ v. International Paper Co.*, 943 F.2d 589, 592 (5th Cir.1991).

Once the moving party has fulfilled its burden and shown that no factual issues exist which could warrant a trial, the burden shifts to the non-movant to come forward with specific facts showing that a genuine dispute still exists. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Clark v. Coats & Clark Inc.*, 929 F.2d 604 (11th Cir.1991). This burden shifts back to the non-moving party, however, *only* after the moving party meets its initial burden and shows that no factual issues remain for trial. *Russ*, 943 F.2d at 592. If the moving party does

not meet its initial burden, the non-movant is not obligated to put forward additional evidence.

■ The District Court's duty is to view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *See Bradbury v. Wainwright*, 718 F.2d 1538, 1543 (11th Cir. 1983). In deciding a motion for summary judgment, it is not the Court's function to decide issues of genuine material fact. Rather, the Court's function is to determine whether such an issue exists to be tried. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Warrior Tombigbee Transportation Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). It is the applicable substantive law which will identify what facts are material. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Facts which in good faith are disputed, but which do not resolve or affect the outcome of the suit will not properly preclude the entry of summary judgment. *Id.* In short, such facts are not material. The materiality of a fact rests solely on the governing substantive law. A district court "can only grant summary judgment 'if *everything* in the record ... demonstrates that no genuine issue of material fact exists.'" *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir.1986), (quoting *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir.1980)).

■ Genuine disputes are those where the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. Moreover, for factual issues to be "genuine" they must have a real basis in the record. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 586, 106 S.Ct. at 1356 (citations omitted). "[T]his standard mirrors the standard for a directed verdict.... [T]he inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

## SECTION 1983 LIABILITY

■ To maintain a § 1983 action, Plaintiff must establish a *prima facie* showing that "the act or omission of a person acting under color of state law deprived plaintiff of a right, privilege or immunity secured by the Constitution or the laws of the United States." *Cannon v. Taylor*, 782 F.2d 947, 949 (11th Cir.1986) (citation omitted). Here, Plaintiffs have clearly established that the deputies, while acting under color of state law handcuffed decedent and took him away in their patrol car and put him in the County Jail. The question remains, however, whether the deputies' actions constitute a violation of decedent's Fourth or Fourteenth Amendment rights.

## A. INDIVIDUAL CAPACITY LIABILITY.

### 1. *Fourth Amendment.*

■ Plaintiffs claim that decedent was seized in violation of the Fourth amendment when he was taken to the Paulding County Jail. A seizure, however, is the result of a single act, not a continuous fact. *California v. Hodari D.*, —— U.S. ——, 111 S.Ct. 1547, 1550, 113 L.Ed.2d 690, 697 (1991). Consequently, the only time a seizure could have occurred was when the deputies handcuffed decedent while he was at his mother's house drunk and handling a loaded gun.

■ "A seizure triggering the Fourth Amendment's protections occurs only when government actors have 'by means of physical force or show of authority, ... in some way restrained the liberty of a citizen.'" *Graham v. Connor*, 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1988) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)). A seizure alone, however, is not enough; the seizure must be

unreasonable. *Brower v. Inyo County*, 489 U.S. 593, 599, 109 S.Ct. 1378, 1382, 103 L.Ed.2d 628 (1988). The reasonableness inquiry is an objective one: "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397, 109 S.Ct. at 1872 (citations omitted).

■ Assuming, without deciding, that decedent was seized within the meaning of the Fourth Amendment, the Court concludes that the seizure was not unreasonable. When the officers arrived at Ruth Merideth's house decedent was drunk or at least under the influence of alcohol and brandishing a loaded pistol while proclaiming his intent to kill himself. Plaintiffs do not deny that decedent had a loaded gun and that he was talking about killing himself. Judging this situation from an objective viewpoint, it was clearly reasonable for the deputies to take decedent into police custody. Regardless of what happened to him later or where the deputies were going to take decedent after they put him in the patrol car, the deputies' actions were reasonable under the situation and, consequently, the Court grants Defendants' Motion for Summary Judgment as to the Plaintiffs' Fourth Amendment claim.[4]

### 2. *Fourteenth Amendment.*

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." Plaintiffs contend that Defendants deprived decedent of his liberty interest in his personal security when they showed deliberate indifference to decedent's medical needs after they put him in protective custody. Defendants argue, however, that they owed Decedent no duty to prevent him from committing suicide or to provide any

medical care to him because they had gratuitously intervened at the behest of the family and not to enforce any criminal law. Simply stated, Defendants argue that the Fourteenth Amendment does not impose the affirmative duty upon the Sheriff's Department to prevent Decedent from killing himself even after the deputies brought him to the County Jail.

■ The Due Process Clause does not confer an affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests. *DeShaney v. Winnebago County Social Services Dept.*, 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1988). "As a general matter, ... a state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. at 1004. However, in certain circumstances the state has an affirmative duty to protect citizens in its custody or care. *Id.* at 198–200, 109 S.Ct. at 1005.

The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains on individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs ... it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help, but from the limitations which it has imposed on his freedom to act on his own behalf.... In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering

---

**4.** This granting of summary judgment also applies to the Fourth Amendment claims against the County and the official capacity suits against the individuals as Plaintiffs have not pointed to any custom or policy of the County or a decision by the final policy maker to infringe upon Decedent's Fourth Amendment rights. *See*

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1480 (11th Cir.1991).

the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* at 200, 109 S.Ct. at 1005–06.

■ In the case sub judice, Defendants clearly had a duty to protect Decedent's liberty interest once the Deputies took him into custody. When the Deputies, under the orders of Sheriff Grogan, took Decedent to the County Jail, instead of to the Hospital, they undertook an affirmative act "of restraining the [Decedent's] freedom to act on his own behalf." *Id.* Prior to his handcuffing and transportation to the jail, Decedent had the freedom to go to the hospital on his own accord. After Decedent was placed in jail, that freedom was extinguished.

■ Defendants also argue that because Decedent was not being arrested or incarcerated they owed him no duty to render or provide medical care. "Nothing in the [*DeShaney* ] Court's rationale for finding that some affirmative duty arises once the state takes custody of an individual [, however,] can be read to imply that the existence of the duty somehow turns on the reason for taking custody." *Buffington v. Baltimore County, Md.,* 913 F.2d 113, 119 (4th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1106, 113 L.Ed.2d 216 (1991). Consequently, the reason the deputies brought Decedent to the jail does not impact on the measure of care he should have been provided once he was put in the jail cell.

■ The inquiry does not end, however, at the finding of a duty to protect Decedent's liberty interests, Plaintiffs also must show that Defendants were deliberately indifferent to the protection of that interest. *See Popham v. City of Talladega,* 908 F.2d 1561, 1563 (11th Cir.1990). This standard of deliberate indifference to medical needs applies to pre-trial detainees, as well as, prison inmates. *Anderson v. City of Atlanta,* 778 F.2d 678, 686–87 (11th Cir.1985). Although Defendants argue that Decedent was neither a pre-trial detainee or an prison inmate, this Court agrees with the Fourth Circuit in *Buffington* and concludes that the Constitution would not "forbid deliberate indifference to the serious medical needs of pre-trial detainees, but permit such indifference to the needs of one in custody pending emergency psychiatric care." *Buffington,* 913 F.2d at 121. Consequently, if Plaintiffs can show that Defendants acted with deliberate indifference to Decedent's serious medical needs, they would be liable under § 1983.

■ In a jail suicide case, "an allegation of deliberate indifference must be considered in light of the level of knowledge possessed by officials involved, or that which should have been known as to an inmate's suicidal tendencies." *Popham,* 908 F.2d at 1564. This Court concludes that questions of material fact remain as to whether Sheriff Grogan and the John Doe deputies acted with deliberate indifference to Decedent's medical needs. Sheriff Grogan was informed via the radio that Decedent was talking about suicide and the two deputies that arrested him also were aware of Decedent's suicidal tendencies. Furthermore, the jailer who found Decedent after he hung himself was also aware of Decedent's intent to kill himself. However, no evidence has been introduced to establish that either the Commissioners or Deputy Hunton knew that Decedent was in custody or that Decedent had threatened suicide; therefore, the Fourteenth Amendment claim against these Defendants is dismissed.

■ Defendant Grogan argues that he is entitled to qualified immunity because it was objectively reasonable for him to believe that his actions did not violate any clearly established rights of Decedent. This Court does not agree. To determine if an alleged right is clearly established at the time of the alleged infringement, the Court looks to "the law established by the Supreme Court, the courts of appeals, and the district courts." *Greason v. Kemp,* 891 F.2d 829, 833 (11th Cir.1990). At the time Decedent committed suicide, a reasonable person in Sheriff Grogan's position would have known that providing inadequate psychiatric care to a person in his custody

could violate that person's fourteenth amendment due process rights. *See DeShaney v. Winnebago County Social Services Dept.,* 489 U.S. 189, 200, 109 S.Ct. 998, 1006, 103 L.Ed.2d 249 (1988); *Buffington v. Baltimore County, Md.,* 913 F.2d 113, 120 (4th Cir.1990); *Anderson v. City of Atlanta,* 778 F.2d 678, 686–87 (11th Cir. 1985).

Accordingly, summary judgment is granted as to the Commissioners and Defendant Hunton in their individual capacities, but denied as to Sheriff Grogan and the John Doe Deputy Sheriffs in their individual capacities.

## B. OFFICIAL CAPACITY AND ENTITY LIABILITY.

 Paulding County cannot be held liable for its employees' acts under § 1983 on a theory of respondeat superior; the liability must be founded on an official policy or custom of the county.[5] *Collins v. Harker Heights,* 503 U.S. ——, 112 S.Ct. 1061, 1067, 117 L.Ed.2d 261, 270 (1992) (citing *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)). That is, "only deprivations undertaken pursuant to governmental 'custom' or 'policy' may lead to the imposition of governmental liability." *Mandel v. Doe,* 888 F.2d 783, 791 (11th Cir.1989). Municipal liability is limited "to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality

has officially sanctioned or ordered." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986).[6]

 Here, questions of fact remain concerning whether a policy or custom exists which amounts to deliberate indifference regarding the required medical care to persons in the custody of the Paulding County Jail. Sheriff Grogan, as the final policymaker for the jail, cut back on the availability of medical care to the inmates at the jail. He also allegedly stated that he did not care about people who wanted to commit suicide. These facts alone establish that there remain questions of fact for a jury to decide pertaining to the existence of a custom or policy to show deliberate indifference toward medical care to people housed at the Paulding County Jail.

## STATE LAW CLAIM

In addition to their section 1983 civil rights claims, Plaintiffs have alleged a wrongful death claim. Under Georgia law "a child or children, either minor or sui juris, may recover for the homicide of the spouse or parent...." O.C.G.A. § 51–4–2 (Supp.1991). A homicide has been defined as "the death of a human being [which] results from a crime [or] from criminal or other negligence...." O.C.G.A. § 51–4–1 (1982). Here, Plaintiffs allege that the Defendants negligence in failing to properly monitor and care for Decedent caused his death. Defendants contend that Decedent assumed the risk of dying because he was

---

5. Although Plaintiffs have named all the individual Defendants as being sued individually and in their official capacity, the real target of the official capacity suit is Paulding County. "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's policy or custom must have played a part in the violation of federal law [or the Constitution]." *Hafer v. Milo,* 502 U.S. ——, 112 S.Ct. 358, 361–62, 116 L.Ed.2d 301, 309 (1991) (citation omitted). Consequently, this Court will consider all the allegations relating to the official capacity suits against the individual defendants as being one suit against the County.

6. A municipal act may include "a single decision made by a [county] official if that official is the final policymaker with respect to the subject

matter in question." *Mandel v. Doe,* 888 F.2d 783, 793 (11th Cir.1989). "In making the determination [of who is the final policymaker], the Court should examine the relevant positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law." *Id.* In this case, Sheriff Grogan is the final policymaker with regard to the operation of the jail and the caliber of medical care to be provided inmates at the jail. Consequently, the official capacity suits against Defendants Hunton, Williams, Helms and Walton are moot as these individuals do not make the policy for the jail. If a policy of deprivation does exist, the County would be liable and Sheriff Grogan in his official capacity would be liable. No other parties would be liable in their official capacities.

lacking in ordinary care for his own safety. Defendants also argue that the County Commissioners are entitled to summary judgment as they are not in control of the jail, nor do they employ anyone is the sheriff's department. Both Defendants Grogan and Hunton claim that respondeat superior is inapplicable to them because they are public officials.

First, Defendants are correct in stating that the Commissioners are not liable for the death of Decedent because they have no authority over the operations of the jail or the sheriff's department. *See Pettus v. Smith,* 174 Ga.App. 587, 588, 330 S.E.2d 735 (1985); *Keener v. Kimble,* 170 Ga.App. 674, 317 S.E.2d 900 (1984). Second, " '[t]he rule of respondeat superior does not apply where public officers are sought to be bound by the negligence of subordinate officers or employees, *unless* ... the officers have actual knowledge of the negligent acts of their employees, *and* their knowledge coupled with a refusal to correct or properly instruct such employees, amounts to a ratification of such negligent acts.' " *Peavy v. Chavers,* 121 Ga. App. 354, 355, 173 S.E.2d 749 (1970) (quoting *Mathis v. Nelson,* 79 Ga.App. 639, 54 S.E.2d 710 (1949)) (emphasis added). Plaintiffs have introduced no evidence which shows that Defendant Hunton had any knowledge of Decedent's incarceration or suicide until after the incident occurred; consequently, as a matter of law, he cannot be responsible under a theory of respondeat superior.[7]

As to the remaining Defendants, triable issues of fact remain which prevent the granting of summary judgment in their favor. Sheriff Grogan may be liable under a theory of respondeat superior because he had knowledge of Decedent's suicidal intent and evidence exists to show that he may have ratified the negligent acts of his subordinates. The unnamed deputies may be liable for their negligence in not taking the proper actions to prevent the suicide.

In *Sneider v. Hyatt Corp.,* 390 F.Supp. 976 (N.D.Ga.1975), Judge Freeman held that a public hotel may be liable for the wrongful death of a hotel guest who committed suicide because of the knowledge the hotel had regarding the decedent's state of mind and because of the peculiar circumstances surrounding her check-in to the hotel and her rambling in the hallways of the hotel. The *Sneider* Court stated that the "most common test of negligence [in a suicide case] is whether the consequence of the alleged wrongful act are foreseeable. The question for the jury is whether danger should have been recognized by common experience, or by the special experience of the alleged wrongdoer, or by a person of ordinary prudence and foresight." *Id.* at 979. Here, some of the sheriff deputies had specific knowledge concerning the suicidal intent of decedent, but these deputies did not insure that all the necessary parties also had this knowledge. This lack of communication among the various jail personnel is enough to establish a question of fact for the jury to decide whether the deputies' negligence caused decedent's death.

## CONCLUSION

Plaintiffs alleged violations of Decedent's Fourth, Eighth and Fourteenth Amendment rights. Plaintiffs dismissed their Eighth Amendment claim and this Court grants summary judgment to all Defendants on the Fourth Amendment claim. The Defendants Helms, Walker and Williams are dismissed from this case as they are not responsible for the operation of the jail or the employment duties of the deputies and they did not have actual knowledge of decedent's incarceration or suicidal intent. Defendant Hunton is not liable in his individual or official capacity under the Fourteenth Amendment as he is not the final policymaker for the jail and he

---

7. This exception to the respondeat superior rule would also apply to the Commissioners even if the Court found that they had any control over the operations of the jail or that the deputies in fact worked for the Commissioners. No evidence exists in the record which tends to establish that any of the Commissioners had any knowledge of Decedent's incarceration or intent to commit suicide until after decedent was dead.

did not have actual knowledge of decedent's suicidal intent. Nor is he liable for the wrongful death claim because he is a public official who had no personal knowledge of the decedent's incarceration or suicidal intent. Therefore, the claims which remain for trial are: (1) a Fourteenth Amendment claim against Sheriff Grogan in both his individual and official capacity; (2) a Fourteenth Amendment claim against the John Doe Deputy Sheriffs in their individual capacities; and, (3) a wrongful death claim against Sheriff Grogan and the John Doe Deputy Sheriffs.

Accordingly, this Court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment.

IT IS SO ORDERED.