Julio PINO, Plaintiff,

v.

THE CITY OF MIAMI, a political subdivision of the State of Florida, Defendant.

No. 02–23175–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Feb. 18, 2004.

Michael Benjamin Feiler, Feiler & Leach, Coral Gables, FL, for Julio Pino, plaintiff.

Alejandro Vilarello, Julie Ofelia Bru, Mimi Vivien Turin, Miami City Attorney's Office, Nina Quinn Rose, Julie Ofelia Bru, Miami City Attorney's Office, Miami, FL, for City of Miami, a political subdivision of State of Florida, Jorge Cadavid, Police Major, Franklin Christmas, Raul Martinez, defendants.

## ORDER GRANTING DEFENDANT, CITY OF MIAMI'S MOTION FOR SUMMARY JUDGMENT

ALTONAGA, District Judge.

**THIS CAUSE** came before the Court upon Defendant, the City of Miami's Motion for Summary Judgment (**D.E. 37 & 38**), filed on November 25, 2003. The Court has reviewed the Motion, the response and reply memoranda, and applicable law, and heard oral argument on February 12, 2004. For the reasons set forth below, the Motion for Summary Judgment is **GRANTED**.

### I. INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff, Julio Pino ("Pino"), filed the Complaint in this action on October 28, 2002. Pino, a police sergeant, contends that he was retaliated against by being transferred to a less desirable position because he complained about a superior interfering with an ongoing murder investigation. The initial Complaint raised claims only against the City of Miami ("City"). An Amended Complaint filed on February 18, 2004 asserts the same claims against the City, and three City of Miami police officers, Franklin Christmas ("Christmas"), Jorge Cadavid ("Cadavid"), and Raul Martinez ("Martinez") (collectively, "Defendants").[1]

In Count I of the Amended Complaint, Pino sues Defendants for violation of 42 U.S.C. § 1983 (" § 1983"), alleging that the Defendants deprived him of his First and Fourteenth Amendment rights not to be discharged from public employment in retaliation for public speech on a matter of public concern. He relies on "[t]he First Amendment right to freedom of speech on matters of public concern, to wit: Pino's right to speak at a public forum regarding views on a matter fairly considered as

---

**1.** Pino was permitted, by Order dated February 13, 2004, to amend the Complaint to include identical claims against Christmas, Cadavid and Martinez (D.E.73).

relating to a matter of political, social or other concern to the community," *i.e.,* "whether a high-ranking official in the police department is [sic] obstructing a murder investigation is clearly a matter of legitimate public concern." (Amended Complaint, ¶ 20). Pino alleges that the City is liable for the deprivations caused by Christmas and Martinez pursuant to an established policy, custom or usage because: (1) "The City, through the highest ranking available supervisory personnel, approved of, acquiesced to and/or condoned the First Amendment violations in general, thereby ratifying and approving the wrongful acts of their officials;" (2) "The City failed, through knowing and/or reckless and/or deliberate and/or conscious indifference, to instruct, supervise, control and discipline, on a continuing basis, the duties of personnel and officials to refrain from unlawfully retaliating against employees for exercising their First Amendment rights;" and (3) "The City did not properly train their personnel despite actual knowledge of their deficiencies and/or through deliberate indifferent [sic] to those deficiencies." (Amended Complaint, ¶ 25). It is further alleged in Count I that "Defendants had the power to prevent or aid in preventing the commission of the aforementioned violations and could have done so by reasonable diligence; instead, Defendants knowingly, recklessly and with deliberate and/or conscious indifference failed or refused to correct the constitutional violations and/or tacitly approved such wrongs." (Amended Complaint, ¶ 26).

In Count II of the Amended Complaint, Pino sues the Defendants for violation of Florida's Whistle-blower's Act, Section 112.3187 of the Florida Statutes (the "Whistle-blower's Act"), alleging that Defendants subjected Pino to an adverse employment action in retaliation for his disclosure of damaging information. Pino demands judgment against the Defendants for declaratory relief, compensatory damages, punitive damages, injunctive relief, reinstatement, back pay, attorney's fees and costs.

The City seeks summary judgment on Counts I and II.[2] The City argues that, as to Count I brought under § 1983, Pino cannot establish municipal liability since there is no evidence of a policy or custom attributable to the City that approves or authorizes retaliation against employees who disclose information about misconduct on the part of high-ranking officials in the police department; and furthermore, none of the individuals that Pino identified as having been involved in the decision to transfer him from "homicide" to "patrol" was a final policymaker for the City on personnel matters.[3] As to Count II under the Whistle-blower's Act, the City contends that the record evidence conclusively establishes that Pino could have, but did not, request a hearing by the City's Civil Service Board to review the action (his transfer) that Pino alleges constituted retaliation, and thus, because he failed to exhaust his administrative remedies, he is precluded from bringing this action.

## II. *FACTUAL BACKGROUND*[4]

Pino started working for the City as a police officer in April of 1987. Sometime

2. At the time the City's Motion for Summary Judgment was filed, the Complaint had not yet been amended, but the subsequent amendment simply adds the three police officers as Defendants, and does not otherwise change the claims in Counts I and II.

3. The City moves for summary judgment on this count on other grounds, but this is the

only ground addressed in this Order because it is dispositive.

4. The facts are taken from the parties' Statements of Material Facts submitted in connection with summary judgment and the documentary and testimonial evidence in the

in 1993, Pino was assigned to the homicide unit as an investigator. In 1995, he was promoted to the rank of sergeant and was transferred to patrol for approximately a year or two. In 2000, he worked in the homicide unit.

## A. *Facts Relating to the Investigation of the Wayne Williams Homicide*

In his capacity as a sergeant in the homicide unit, Pino was responsible for investigating the September 14, 2000 shooting of 22–year–old suspected drug dealer, Wayne Williams, at Northwest 13th Avenue and 63rd Street. The assault unit handled the initial investigation until Wayne Williams passed away on September 15, 2000, at which point the case was transferred to the homicide unit. The team working on the Williams investigation included Pino, Detectives David or "Dave" Patton ("Patton"), Altarr Williams ("Detective Williams"), and Moises Velazquez ("Velazquez"). This unit was supervised by Lieutenant Israel Gonzalez ("Gonzalez"). Patton was the lead detective.

The victim's brother, who was not an eyewitness, identified a suspect. The investigation revealed that immediately after the shooting, the police department received a 911 call from the residence of Renee Bostic. The caller was identified as Tammy Renee Bostic. On September 16, 2000, Pino and Patton interviewed Ms. Bostic. Ms. Bostic stated that she had heard gunshots but did not see the shooting. Ms. Bostic indicated that when she heard the shots, she ran to her front door and yelled for her thirteen-year-old son to come inside. She further stated that her son was playing football with some friends at the time of the shooting.

Pino and Patton asked if they could talk to her son, and Ms. Bostic agreed. Ms. Bostic's son told the officers that he and his two friends saw a driver get out of a car, talk to the victim, and then they heard two gunshots and saw the victim fall to the ground. At one point, the shooter told the three boys to move across the street next to a pole. According to Pino, the Bostic boy indicated that he could identify the shooter if he saw him again.

Based on this information, Pino and Patton determined that they should show the Bostic boy a photographic line-up and obtain a formal statement from him. Therefore, they arranged for Ms. Bostic and her son to meet them in two days at the police station. Pino provided Ms. Bostic with his business card and told her to call him if she had any problems. During the course of this initial meeting with Ms. Bostic, she asked the officers if they knew Major Frank Christmas with the City of Miami Police Department. Pino told her that Christmas was their boss, and joked that she should tell him what a great job they were doing. Either Pino or Ms. Bostic then suggested that their meeting in a couple of days be held in Christmas' office at the police station.

When Ms. Bostic and her son failed to show up at the scheduled appointment, Pino and Patton made several attempts to reach them by telephone but discovered that the phone number had been disconnected. A plan was then formulated to send a police officer in plainclothes to make contact with Ms. Bostic at her residence. Detective Williams was chosen to make contact so as to avoid suspicion and protect the family from danger as a result of cooperation with the police. Upon arrival at the Bostic residence, Ms. Bostic authorized Detective Williams to talk to her son, although she denies that she authorized him to take her son to the police station without her being present. None-

record, and are undisputed unless otherwise noted.

theless, Detective Williams transported the Bostic boy to the police station.

At the police station, the photographic line-up was shown to Ms. Bostic's son and he failed to identify the suspect (the one identified by the victim's brother). The boy identified someone else (a person known not to be the shooter) to Detectives Pino, Williams, Patton and Velazquez, and was then returned home in the same covert manner. In Pino's opinion, this was a deliberate misidentification. According to Pino, the boy purposefully "misidentified" someone else in the photographic line-up because, between September 16 and September 18, someone got to the Bostic family and advised them not to cooperate.

The suspect was, however, identified by one of the other boys who had been playing football with the Bostic boy on the day of the shooting. These other two boys, brothers, were brought to the police station for questioning. The boys were picked up at their home by Detective Williams using the same undercover approach. One boy began to cry during the interview. The other boy identified the suspect from the photographic line-up. Pino's team then decided to present the case to the State Attorney's Office.

The boys' parents arrived at the police station while they were being questioned and became upset, arguing that no one had given the officers permission to question their sons or bring them to the station. The parents were not aware that the boys' grandmother had given Detective Williams permission to walk the boys over to the police station to be interviewed. The grandmother later stated that Detective Williams did not tell her that the police wanted to speak to the boys about a homicide, but rather only mentioned that police wanted to talk about the "community," and the "environment that they live in." The boy later recanted his identification of the suspect, stating that he had merely guessed so that the police would stop asking him questions.

On September 20, 2000, Christmas, who was the head of the homicide unit at the time, called Pino and told him that threats were being made against witnesses in the Wayne Williams case. The following day, September 21, 2000, Christmas met with Gonzalez. Christmas berated Gonzalez and angrily told him, among other things, that his sergeants were out of control, and that the Williams investigation was endangering witnesses. Gonzalez explained to Christmas all of the steps that had been taken to protect the witnesses, and told Christmas that he had no knowledge of any threats to witnesses. Christmas responded by telling Gonzalez that the victim was "only a doper," and that Gonzalez should drop the investigation. Gonzalez informed Christmas that he could not do that. Christmas repeated his demand, and told Gonzalez that he wanted to meet with him and Pino. Gonzalez went to his supervisor, Captain David Rivero ("Rivero"), who agreed with Gonzalez. Rivero told Gonzalez that he would attend the meeting, and would support him. Gonzalez then called Pino and told him to show up for the meeting.

Pino, Gonzalez, Detective Williams, Velazquez, and Rivero met at Christmas' office that same day. Christmas was upset. He maintained that the officers had intimidated witnesses, had detained witnesses against their will, had coerced an identification, and that witnesses were receiving threats. When the various participants in the meeting tried to explain their efforts to conceal the cooperating witnesses, Christmas angrily cut them off. Christmas allegedly told the officers not to contact the witnesses or to do any other canvassing of the area. Instead, Christmas suggested that they put together a narcotics case against somebody and then get them to

testify against the suspect in the Williams case. Christmas also told Rivero to get the witnesses involved in the witness protection program.

Immediately after the meeting in Major Christmas' office, Rivero met with Pino, Detective Williams, Velazquez, and Gonzalez. Rivero told them that Christmas was wrong. He told them that they should do whatever they needed to do, including continuing to interview witnesses or performing area canvasses, and that Rivero would "take the heat." When Captain Rivero walked out of the office, Gonzalez told the officers that they should forget what Rivero had just said because Rivero would not really stand up for them. Instead, the officers should do what they needed to do, and, if asked, they should say that Gonzalez had given them their orders, not Rivero.

On September 22, 2002, Pino requested a meeting with the State Attorney's Office. He reported this to Rivero so as to appropriately update the chain of command. On September 26, 2000, Pino was approached by Detective Williams, who encouraged Pino to apologize to Christmas, but Pino said he would not do this. On September 27, 2000, Pino received a call from Gonzalez indicating that Gonzalez had heard Pino may be getting transferred.

Gonzalez has testified that Christmas continued to push him to drop the Williams investigation, and also told Gonzalez to transfer Pino. Christmas ordered Gonzalez to transfer Pino because of Pino's "approach" during the Wayne Williams investigation. Gonzalez indicated that he would not transfer Pino because Pino had done nothing wrong, and that Christmas should transfer Gonzalez if he had a problem with that. On one occasion, Gonzalez spoke to Officer Angel Calzadilla ("Calzadilla"), who was the Senior Executive Assistant to then Chief of Police, Raul Martinez. According to Gonzalez, he told Calzadilla about some of the conflicts that had arisen between himself, Christmas and Pino. A meeting was arranged with Chief Martinez.

Gonzalez told Pino to report for a meeting with Martinez. Prior to this meeting, it is known that Martinez had separately met with Christmas and Rivero. The meeting between Pino, Gonzalez, and Martinez took place on September 27, 2000. According to Pino and Gonzalez, they expressed their concerns to Martinez about the Williams investigation, Christmas' conduct, and the issue of Pino being transferred. There are disputes, however, about what was discussed at this meeting. Martinez claims that Pino and Gonzalez did not make allegations of corruption by Christmas during this meeting. Regarding the difference of opinion on investigative techniques, Martinez stated that he would not "micro manage" Christmas' department. As to the rumors about Pino's transfer, Martinez said Gonzalez that a transfer would be up to Christmas, but that he did not think Pino would be transferred.

According to Pino, Christmas was very upset about the fact that Pino had gone to see Martinez. However, Pino believes that Martinez prohibited Christmas from transferring Pino out of the homicide unit at that time. On September 27, 2000, Christmas met with Pino and told him that if he received a transfer, it would be because he had performance problems, and in particular, he had "people issues." Christmas told Pino that he was good, but he needed to be "tweaked."

On September 28, 2000, Pino received a telephone call from Ms. Bostic, who was inquiring about relocation. According to Pino, in the first few minutes of the conversation, Ms. Bostic stated that Christmas had told her that she did not have to cooperate in the investigation and that her son did not have to testify. According to

Pino, Ms. Bostic also stated that Christmas had told her that he would remove her son from the witness list. Ms. Bostic was a friend and co-worker of Christmas' wife.

Pino activated a tape recorder during this call and recorded portions of the conversation. Velazquez and Detective Williams were present in the room while Pino was recording the conversation. Pino gave them a direct order not to get involved. He took the tape home that evening and secured it. According to Pino, he was evaluating the ramifications of what he had in his possession. Pino did not disclose the existence of the tape-recorded conversation with Ms. Bostic to anyone in the police department or the State Attorney's Office until eight months later, on May 21, 2001. In deposition, Pino was asked why he did not go to anyone in the police department during the time that he had the tape in his possession. He responded that there was no one he could trust.

The investigation into the Williams murder continued, and pursuant to Christmas' order, Pino's team did not make further contact with the juvenile witnesses involved. On December 7, 2000, Pino was called in by his new lieutenant, Cadavid, and was told he was being transferred. Between December 2000 and May 2001, Pino worked out of the homicide unit but was assigned to a Federal Bureau of Investigation ("FBI") task force working with juvenile gangs and the special investigations section. Cadavid told Pino that this transfer was made because Cadavid did not like Pino's style of supervision, and he did not like the way he had handled an unrelated investigation. Pino asked Cadavid if Christmas was behind his decision, and Cadavid said it was exclusively his (Cadavid's) decision.

Before going to the FBI task force, Pino put out a "message" on one of the witnesses to the Williams murder, alerting

police officers that if they stopped or arrested this person they were to contact him or one of the other two detectives that had been involved in the Williams case. Miami Beach police arrested this witness on other charges and Velazquez and Patton took a statement from the witness. The witness corroborated a motive for the suspect that had been identified by the victim's brother. Detective Patton requested that Pino go with him to the State Attorney's Office to discuss this new evidence.

Pino testified in his deposition that, as he was sitting in the State Attorney's Office on May 21, 2001, something came over him and he told the Assistant State Attorney that Christmas had been sabotaging the Williams investigation from day one. Pino revealed the existence of the taped conversation with Ms. Bostic, and eventually turned over the tape to the Assistant State Attorney. Apparently, this was leaked to the department by Detective Patton.

The night that Pino released the tape to the Assistant State Attorney, he was visited at his residence late at night by an investigator with the Police Department Internal Affairs unit, who asked him questions about the his involvement with the Wayne Williams case and demanded the tape. The matter was viewed by the City of Miami Police Department as an investigation of Pino, not of Christmas. Shortly thereafter, in June of 2001, Pino was permanently transferred to the midnight shift in the patrol unit. Pino claims that this was an adverse employment action because the midnight patrol shift is not nearly as prestigious a position as that of a sergeant on the homicide squad, and it has less desirable hours and fewer overtime opportunities. Pino "inquired all the way up the chain of command as to the reason for the transfer," and only Cadavid offered

an explanation. (Affidavit of Julio Pino ("Pino Aff."), ¶ 6). Cadavid told Pino that the transfer was based on Pino withholding evidence in a homicide case and failing to report an act of corruption.

The State Attorney's Office conducted an investigation into Christmas' conduct. The State Attorney ultimately determined that, based upon Pino's allegations, there was insufficient evidence beyond a reasonable doubt that Christmas had obstructed justice by ordering that the homicide investigation be dropped, or by preventing officers from interviewing witnesses. However, the State Attorney noted in a close-out memo that Pino's allegations did not appear to be frivolous and that "Sergeant Pino was transferred out of Homicide and put on midnight patrol in direct response to his actions in making the report that led to this investigation." (Affidavit of Israel Gonzalez ("Gonzalez Aff."), Exhibit B, Close–Out Memo, p. 15).

B. *Relevant Provisions of the City of Miami Charter, the Code of the City of Miami, and Departmental Orders of the City of Miami Police Department*

Several City legislative pronouncements and administrative rules provided administrative remedies to Pino for the acts of which he complains.

1. *City of Miami Charter*

Section 16 of the City of Miami Charter provides that the "powers and duties of the city manager shall be to":

(b) Appoint and remove, except as otherwise provided in this Charter, all directors of the departments and all subordinate officers and employees in the departments in both the classified and unclassified service; all appointments to be upon merit and fitness alone, and in the classified service all appointments and removals to be subject to the civil service provisions of this Charter.

(c) Exercise control over all departments and divisions created herein or that may be hereafter created by the city commission.

Section 20 addresses the powers and duties of the "directors of department," which includes the Chief of the City of Miami Police Department:

Each such director ... shall conduct the affairs of his or her department in accordance with rules and regulations made by the city manager, shall be responsible for the conduct of the officers and employees of his or her department ... and, subject to the supervision and control of the city manager in all matters, shall manage the department.

Section 24 also addresses the duties of the Chief of Police, stating:

The head of the department of public safety shall be known as the director of public safety.

Subject to the supervision and control of the city manager in all matters, the head of the department of public safety shall be the executive head of the division of police and fire. . . .

The police force shall be composed of a chief and such other officers and other employees as the city manager may determine. The chief of police shall have the immediate direction and control of the police force, subject to the supervision of the director of public safety, and to such rules, regulations and orders as the said director may prescribe, and through the chief of police, the director of public safety shall promulgate all orders, rules and regulations for the government of the police force.

Section 36 of the Charter creates the Civil Service Board, and defines the "unclassified" and "classified" civil service.

According to Section 36, all police officers having a rank above captain are considered "unclassified," while all other police officers "not specifically included by this Charter in the unclassified service" are considered part of the "classified service." Therefore, a sergeant in the police force, such as Pino, is part of the "classified service." According to subsection (d) of Section 36:

Subject to the approval of the city commission, the board [Civil Service Board] shall adopt, amend, and enforce a code of rules and regulations which shall have the force and effect of law providing for the appointment and employment in all positions in the classified service, based on merit, efficiency, character, and industry; shall make investigations concerning the enforcement and effect of this article and of the rules adopted; and shall make an annual report to the city commission.

Subsection (f) of Section 36 provides the Civil Service Board with powers of suspension, removal, fine, or demotion, and states in pertinent part:

(1) Any officer or employee in the classified service may be removed, suspended, fined, laid off, or demoted by the city manager or by the head of the department in which such person is employed, for any cause which will promote the efficiency of the service; but such person must be furnished with a written statement of the reasons therefor within five days from the date of the removal, suspension, fine, layoff, or demotion,[5] and be allowed a reasonable time for answering such reasons in writing, which answer shall be made a part of the records of the board, with the suspension to take effect as of the date that such written statement is furnished....

Any employee in the classified service who deems that he or she has been suspended, removed, fined, laid off, or demoted without just cause may, within 15 days of such action, request in writing a hearing before the civil service board to determine the reasonableness of the action. The board shall, within 30 days after appeal of the employee disciplined, proceed to hear such appeal. After hearing and considering the evidence for and against the employee, the board shall report in writing to the city manager its findings and recommendations. The city manager shall then sustain, reverse, or modify the action of the department director. Any member of the civil service board and the director of personnel may administer an oath to witnesses appearing before said board or before said director in an investigation, disciplinary or appeal proceedings, and they shall have the power to issue witness subpoenas and to compel the attendance of witnesses.

Under Section 36(I), the Board has the power to compel the production of "books and papers pertinent to the investigation." Finally, Section 36(k) provides that "[t]he civil service board, subject to the approval of the city commission, shall determine the penalties for the violation of the civil service provisions of this Charter."

2. *Code of the City of Miami*

Section 40–122 concerns "[d]isciplinary actions generally," and provides:

(a) *Authority of city manager, department director; appeals to board; investigatory, evidentiary powers of board.* Any officer or employee in the classified service may be removed, fined, laid off, or reduced in grade by the city manager

---

**5.** As will be addressed below, Pino's grievance did not involve a removal, fine, layoff or demotion, and thus, this provision does not apply. However, the general procedures of the Civil Service Board outlined here do apply to Pino's grievance.

or by the director of the department in which he/she is employed, for any cause which will promote the efficiency of the service; but he/she must be furnished with a written statement of the reasons therefor within five days from the date of the removal, suspension, fine, layoff, or reduction in grade, and be allowed a reasonable time for answering such reasons in writing, which shall be made a part of the records of the board; and he/she may be suspended from the date when such written statement of reason is furnished him/her. No trial or examination of witnesses shall be required in such case except at the discretion of the city manager or the department director.

Any employee in the classified service who deems that he/she has been suspended, removed, fined, reduced in grade or demoted without just cause may, within 15 days of such action by the department director, request in writing a hearing before the civil service board to determine the reasonableness of the action. The board shall, within 30 days after appeal of the employee disciplined, proceed to hear such appeal. After hearing and considering the evidence for and against the employee, the board shall report in writing to the city manager its findings and recommendations. The city manager shall then sustain, reverse or modify the action of the department director.

In the event the city manager shall not have completed his action to sustain, reverse, or modify the action of the department director within 60 days of the receipt by the city manager of the report of the determination of the civil service board of an appeal of a disciplinary matter filed by an employee of the city, the city manager shall report in writing to the city commission the reason for the delay. If the delay continues thereafter, the city manager shall file a supplemental report, setting forth the reasons for the continuing delay on each tenth day following, during which he shall have failed to take the final action required.

(emphasis in original).[6]

Section 42–2 of the City Code is titled "[a]ppointment of director of police department," and provides that "[t]he city manager is hereby authorized to appoint a director of the police department who shall serve subject to supervision and the control of the city manager." Additionally, Section 42–3 addresses the "powers and duties of director of police department," and states:

Subject to the supervision and control of the city manager in all matters, the director of the police department shall administer the affairs of the department which shall include the immediate direction and control of the police force, and he is charged with responsibilities for the prevention, control and suppression of crime in the city.

Section 42–70 provides for review of a disciplinary recommendation as follows:

(a) *Departmental disciplinary review board.* Pursuant to any existing collective bargaining agreement, the said officer against whom disciplinary action is recommended pursuant to section 42–69 may request a hearing before the departmental disciplinary review board, which will make advisory determinations and nonbinding recommendations to the chief of police. The OPC shall be informed in writing of this decision.

---

**6.** Once again, for the reasons stated below, Pino's grievance was not "disciplinary" in nature, making this provision, as well as Section 42–70, inapplicable to his grievance. The provisions are nonetheless cited for background.

(b) *Chief of police.* The chief of police has the option to concur with the departmental disciplinary review board's recommendation or take alternate action. The officer is to be informed of the chief's decision and may choose to appeal the decision to the civil service board. The OPC shall be informed in writing of this decision.

(c) *Civil service board.* Should the officer timely choose a civil service hearing, the civil service board shall review the case and provide its findings and recommendations to the city manager. The OPC shall be informed in writing of this decision.

(d) *City manager.* The city manager shall review the case and make a decision thereon. The city manager may decide to accept the recommendation of the civil service board or take alternate action. The OPC shall be informed in writing of this decision.

(emphasis in original).

Finally, Section 40.128 of the Code addresses "grievances and abuses generally," providing as follows:

(a) *Investigations by the board.* **Whenever the board has reason to believe that this article has been violated by the abuse of power in recommending or making an appointment to any position, or in a layoff, demotion, suspension, or removal without justification, or in any other manner, it shall be the duty of the board to investigate.** If, in making this investigation, the board shall find that said violations were contrary to the intent and spirit of this article, it shall make a report thereof to the director of the department involved and to the city manager.

(b) *Complaint by employee.* **Any employee who is aggrieved by reason of**

**what he/she considers a violation of this article to his/her detriment, or who has a grievance concerning his/her employment under this article, and who desires redress, shall notify the executive secretary in writing, stating the nature of his/her grievance and requesting a hearing by the board.**

(1) Upon receipt of such notice, the executive secretary shall promptly inform the board, and the board shall schedule the matter for a hearing within 30 days of the date of receipt of the notice by the executive secretary, who shall notify the employee of the time, date and place of hearing.

(2) If the board so desires, it may make a preliminary investigation of the matter before the hearing.

(3) The employee shall appear before the board at the scheduled time and place, and shall present pertinent information to the board concerning his/her grievance.

(4) The board shall consider the matter, and promptly present its findings and recommendations to the city manager for his/her consideration of a proper remedy, if a remedy is necessary.

(bold emphasis added; italics emphasis in original).[7] According to Tishria Mindingall, the Executive Secretary of the City of Miami's Civil Service Board, "[a]ny employee that is member of the civil service [such as Pino] and is aggrieved by reason of what he/she considers a violation of the civil service rules or who has a grievance concerning his/her employment and who desires redress is entitled to request a hearing by the Civil Service Board." (Affidavit of Tishira Mindingall ("Mindingall Aff."), ¶¶ 3, 4). Moreover, "[t]he Civil Ser-

---

**7.** This is the provision that provides for administrative review of Pino's particular griev-
ance. *See infra.*

vice Board has the power and authority to investigate, consider and promptly present its findings and recommendations to the city manager for his consideration of a proper remedy, if a remedy is necessary in matters such as allegations that pertain to adverse employment actions by a department director or supervisor that are motivated by retaliation against an employee for whistle-blowing activities." (*Id.*, ¶ 6).

3. *Departmental Orders of the City of Miami Police Department*

Departmental Order, Chapter 12, provides employees a review procedure by the Departmental Disciplinary Review Board ("DDRB") before the Chief of Police takes final action on disciplinary matters. The Board reviews disciplinary actions that recommend a forfeiture of time and/or suspension not in excess of two tours of duty, demotion or dismissal. (Departmental Order, Ch. 12, § 12.4.5.1). Thus, "employees are not entitled to a D.D.R.B. hearing when reprimands are issued without time loss or a change in employment status."[8] (Departmental Order, Ch. 12, § 12.1.3). Section 12.3 provides that "[a]ll determinations, actions, and recommendations made by the D.D.R.B. or its Chairman are sent to the Chief of Police for review and consideration." (Departmental Order, Ch. 12, § 12.3).

Departmental Order 1, Chapter 11, Section 11.6.24.1, discusses grievance procedures, and states:

Members and civilian employees who feel aggrieved shall discuss their difficulties and differences with their superior officer and pursue the chain of command (up to and including the Chief of Police) in an attempt to resolve the grievance. They shall not discuss their grievances with other departmental members or civilian employees (of equal or lower grade) or with persons outside the Po-

lice Department. Members and civilian employees having a grievance involving another member or civilian employee, which cannot be resolved amicably, shall consult their immediate superior officer. This is not to be confused with the Labor Contract Grievance Procedure.

Departmental Order 1, Chapter 11, provides:

11.4.4.2 *Personnel Actions.* Commanding officers shall manage the personnel problems that may arise in their command. They will issue reprimands, when necessary, and recommend disciplinary action of hours or days off, where necessary, with the approval of the Chief of Police. They will recommend suspensions, demotions, or dismissals, where necessary, after taking into consideration all pertinent facts and circumstances.

11.4.4.3 *Decision of the Chief of Police.* In all cases, the final departmental action and decision for further action of suspension, or dismissal shall rest with the Chief of Police.

(emphasis in original). Section 11.6.29.1, Chapter 11 of this Departmental Order further requires police officers to "acquire a thorough knowledge of the City Ordinances and Regulations, County Codes, and State and Federal Statutes; of which the Police Department take cognizance, as well as the elements that constitute criminal acts in violation of the various sections thereof." Moreover, Section 11.6.29.3 requires police officers to "conform to and abide by the Rules and Regulations, Departmental Orders and other directives of the Police Department, the Ordinances of the City of Miami and the County of Dade, and the laws of the State of Florida and the United States of America."

Departmental Order 6, Chapter 1, Section 1.4.21 sets forth a policy and proce-

---

8. As set forth below, Pino was not entitled to    review by the DDRB of his grievance.

dure regarding transfers of position within the police department:

> 1.4.21 *Transfer Policy and Procedures:* The purpose of this departmental order is to establish a procedure for the selection and transfer of departmental members ... to a specialized unit.
>
> 1.4.21.1 *Policy Defined:* It is the Police Department's policy to transfer personnel to specialized units on a merit basis, to provide a higher level of effectiveness and efficiency, and to insure that specialized units reflect minority and female representation whenever possible, consistent with departmental minority and female percentages....
>
> 1.4.21.1.3 Notwithstanding the provisions of this order, the Chief of Police shall retain the right to grant or deny transfers when, in his/her judgment, such action is necessary for the efficient operation of the Miami Police Department.

(emphasis in original).

### C. *The Decisionmakers Identified by Pino, and Pino's Attempts to Seek Review of the Transfer Decision*

In the City's interrogatories to Pino, he was asked the following question: "Identify any and all persons, including any employee, agent, official or representative of the City of Miami, or the City of Miami Police Department, who you believed participated or had any involvement with respect to the decision to transfer Plaintiff from Homicide to Patrol." In response, Pino offered the following names and descriptions of actions taken: Chief Raul Martinez (final authority approving the transfer); Assistant Chief Chambliss (Chief of Investigations, approved the transfer); Assistant Chief Gerald Darling (Major of Criminal Investigations at the time of transfer, approved the transfer); Major Franklin Christmas (somehow caused the transfer); Captain David Rivero (Captain of the Criminal Investigations Division, approved the transfer); Major Jorge Cadavid (Lieutenant in charge of the homicide unit at the time of the transfer, recommended and approved the transfer). Pino was also asked the following question: "Identify specifically, who, on behalf of the City of Miami acted unlawfully against you and what specific constitutional rights were violated." Once again, Pino identified the same individuals and the same actions.

Pino was also asked to respond to the following interrogatory: "Identify with specificity all attempts taken by Plaintiff to administratively resolve the issues giving rise to this lawsuit," including "the name, title, address and phone numbers of the individual(s) that were contacted to attempt resolution," "the dates such [contacts] were made," and "the outcome of all such attempts." Pino stated that he went to the following people and received the following responses: Chief Raul Martinez (never responded to Pino's request to meet); Assistant Chief Chambliss (told Pino the decision of the Chief was final, but could not explain why Pino was being transferred); Assistant Chief Gerald Darling (told Pino the "marching order came from above" and that he was newly assigned to the section so there was nothing he could do); Captain David Rivero and Major Jorge Cadavid (did not want to explain why Pino was being transferred); and Lieutenant Ornel ("Al") Cotera ("Cotera") (informed Pino that there was nothing the union could do to avoid the transfer).

Pino maintains, therefore, that he requested meetings up the chain of command to discuss his transfer, but at each level, he was told that nothing could be done. He requested a meeting with Chief Martinez to specifically discuss the transfer, but Martinez never responded to this request. Finally, he went to his union representative, Cotera, to inquire about filing a griev-

ance, and was informed that transfers are within management's rights, not subject to grievance review, and that nothing could be done. Pino asserts that Cotera told him this after he (Cotera) "checked and he talked to a couple of people." (Deposition of Julio Pino ("Pino Depo."), 144:5–11). According to Pino, Cotera told him that "the chief's decision was final and could not be overturned by anyone." (Pino Aff., ¶ 11). Pino admits that Cadavid told him that he was transferred because he had withheld evidence (the tape) and failed to report a criminal act of corruption, but he notes that the City has never offered him an official reason for the transfer. There is no evidence that Pino was ever given the reasons for the transfer in writing.

Having been told by Cotera that there was no avenue for an administrative appeal, Pino then wrote to the Florida Commission on Human Relations, which took no action. This lawsuit was subsequently filed. When asked why he did not file a request for an investigation by the Civil Service Board as to his belief that his transfer to patrol had been in retaliation for accusing Christmas of corruption, he stated that he "had no clue," and "didn't think of it." (Pino Depo., 144:21–23). Pino knew about the Civil Service Board because he had testified before the Board. (*Id.*, 144:21–23). Ms. Mindingall "researched the records kept of requests for hearings by employees and [has] not found any request for hearing submitted by Julio Pino with respect to his allegation that he was transferred to a midnight patrol shift as retaliation because he filed a complaint with the state attorney against Major Frank Christmas." (Mindingall Aff., ¶ 7). In their Affidavits submitted in response to the City's Motion for Summary Judgment, Pino and Gonzalez claim that, based on their experience and knowledge of the Police Department rules and the Civil Service rules, they are "unaware of any mechanism that exists to challenge the Chief's

final decision in a transfer matter." (Pino Aff., ¶ 10; Gonzalez Aff., ¶ 7). Gonzalez has stated that this is so because "transfers within the department are not considered disciplinary in nature and therefore [are] not subject to grievance or review by the Civil Service Board." (Gonzalez Aff., ¶ 7).

## III. LEGAL DISCUSSION

### A. *Standard for Summary Judgment*

Under Rule 56(c), Fed.R.Civ.P., a motion for summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court explained the movant's burden in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) as follows:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Id.* at 322, 106 S.Ct. 2548. The Court further stated that "Rule 56(c) therefore requires a non-moving party to go beyond the pleadings and by [its] own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548.

By its very terms, this standard provides that the mere existence of "*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there will be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Allen v. Tyson Foods,* 121 F.3d 642, 646 (11th Cir.1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Allen,* 121 F.3d at 646. On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party, and determine whether that evidence could reasonably sustain a jury verdict. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Allen,* 121 F.3d at 646.

While the burden on the movant is great, the non-moving party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is "merely colorable" or "not significantly probative," is not enough. *Id.; see also Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir.1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment).

**B. *No Municipal Policy, Custom, or Final Policymaker Was Involved in or Ratified the Decision to Transfer Pino, and therefore, the City is Entitled to Summary Judgment as to Count I***

The constitutionality of the decision to transfer Pino is not addressed in this Order. Assuming it was unconstitutional under the First Amendment as alleged by Pino, in order to hold the City liable Pino has the burden of establishing a government policy or custom that caused a violation of his rights under § 1983. In *Monell v. Dep't. of Social Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities may not be liable under 42 U.S.C. § 1983 on a theory of *respondeat superior.* Instead, municipalities may only be held liable for the execution of a governmental policy or custom.

■ As the *Monell* Court explained: "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by **those whose edicts or acts may fairly be said to represent official policy,** inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. 2018 (emphasis added); *see also Patrick v. Floyd Med. Ctr.,* 201 F.3d 1313, 1313 (11th Cir.2000). Thus, a plaintiff must identify an officially promulgated "policy," or an unofficial "custom" or practice shown through the decisions of a final policymaker, that caused the plaintiff's (constitutional or federal statutory) injury. *Monell,* 436 U.S. at 690–691, 98 S.Ct. 2018; *Grech v. Clayton County, Georgia,* 335 F.3d 1326, 1329–30 (11th Cir.2003); *City of Canton v. Harris,* 489 U.S. 378, 379, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (the government's custom or practice must be "the 'moving force [behind] the constitutional violation.' ") (citations omitted).

■ The Eleventh Circuit has noted that "[o]nly those officials who have final policymaking authority may render the municipality liable under § 1983." *Hill v. Wayland,* 74 F.3d 1150, 1152 (11th Cir. 1996) (citing *Pembaur v. City of Cincinna-*

*ti,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). If a subordinate's decision is at issue, a municipality may be held responsible, and the decision will be considered final, where "the authorized policymakers approve a subordinate's decision **and the basis for it.**" *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). The Eleventh Circuit has interpreted *Monell's* policy or custom requirement to preclude § 1983 municipal liability for a subordinate official's decisions when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion: "[T]he mere delegation of authority to a subordinate to exercise discretion is not sufficient to give the subordinate policymaking authority. **Rather, the delegation must be such that the subordinate's discretionary decisions** are not constrained by official policies and **are not subject to review.**" *Mandel v. Doe,* 888 F.2d 783, 792 (11th Cir.1989) (emphasis added) (citation omitted). Thus, when a subordinate's decision is subject to review by the municipality's authorized policymakers, the policymakers have retained the authority to measure the official's conduct for conformance with their policies. *See, e.g., Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915.

▪ The first inquiry is to "identify those individuals whose decisions represent official policy of the local governmental unit." *Mandel,* 888 F.2d at 793. Identification of the individuals whose decisions represent official policy of the local government unit and will support imposition of liability under § 1983 is a question of state law for the court to decide. *Id.* at 792–93. The court "should examine not only the relevant positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law." *Id.* (citation omitted). In determining whose decisions represent official policy of the local government unit,

the court must ensure that the official possesses authority and responsibility for establishing final "policy" with respect to the subject matter in question. *Id.* The second inquiry, one that is for the jury, is whether "the challenged decision or act of the official caused the deprivation of the plaintiff's rights." *Id.* The second inquiry is not necessary if the first inquiry reveals that the decisionmaker cannot be considered a final policymaker.

▪ In the present case, there is no dispute, raised in connection with summary judgment, that Pino has failed to identify an express municipal policy, law, custom or "widespread practice" of retaliation against employees who complain to the State Attorney about corrupt or criminal conduct by high-ranking officials in the police department. Pino has not identified any policy enacted by the City Manager or the City Commission designed to retaliate against Pino or anyone similarly situated. The issue then is whether the decision to transfer Pino was made by, or ratified by, an official with final **policymaking** authority.

Pino maintains that Cadavid, his supervising lieutenant and the head of the homicide unit at the time of his transfer, recommended and approved the transfer. Cadavid was also apparently the person that officially informed Pino that he was being transferred. Pino also argues that several other superiors approved of his transfer, with the highest ranking official in the City approving the transfer being Martinez.

At the time of Pino's transfer in June 2001, Martinez had the authority to make final departmental employment decisions. Pino and Gonzalez have testified that in September of 2000 they met with Martinez, and during this meeting, Martinez was informed about Christmas' corrupt conduct during the Wayne Williams inves-

tigation and Pino's concern that Christmas would have him transferred. Martinez's response was that he would not "micromanage" the department, and any transfer would be up to Christmas, although Martinez did not think a transfer would occur. When interviewed by the State Attorney during that Office's investigation of Christmas, Martinez testified that Pino and Gonzalez never reported any corrupt or criminal conduct by Christmas to him, and specifically, they never told him that Christmas had ordered that the Williams investigation be dropped or that the officers not talk to any witnesses. According to Martinez, "the main thrust of the meeting that he had with Lieutenant Gonzalez and Sergeant Pino was their concern that Pino was going to be transferred, that Pino had done nothing wrong, and that Major Christmas was second-guessing them on the investigative techniques that they had employed." (Gonzalez Aff., Exh. B, State Attorney's Close–Out Memo, p. 11).

There are, therefore, issues of fact as to what Martinez knew. Pino admits that he believes he was not transferred back in 2000 because Martinez prevented Christmas from taking such action. Pino also maintains, however, that when he was transferred by Cadavid out of the homicide unit approximately one year later, he requested another meeting with Martinez, and this request was ignored. Based on the evidence in the record, and viewing the evidence in the light most favorable to Pino as the non-movant, Martinez is considered to have ratified the transfer for summary judgment purposes only.

Pino's attempt to establish municipal liability in this case, therefore, rests solely on his argument that Martinez is the *Monell* policymaker in this instance. There is no dispute that the other police officers said to have been involved in the transfer are not final policymakers under the *Monell*

analysis. The next issue presented is whether there were any administrative remedies available to Pino to grieve what he considered to be a retaliatory transfer ratified by Martinez.

An examination of the Charter and Code of the City of Miami establishes that the City Manager has explicit authority to override the Chief of Police's decisions, including his employment decisions. For example, Section 16(b) of the Charter authorizes the City Manager to **"appoint and remove"** the Chief of Police; Section 16(c) authorizes the City Manager to "exercise control over all departments and divisions [including the police department] created" by the City Charter; and Section 20 provides that the Chief of Police, and other directors of City departments, "shall conduct the affairs of his or her department **in accordance with the rules and regulations made by the city manager"** and are subject to the **"supervision"** and **"control"** of the City Manager **"in all matters."** (emphasis added). Sections 42–2 and 42–3 of the Code also state that the Chief of Police is subject to the supervision and control of the City Manager **"in all matters."** (emphasis added). Section 36 of the Charter further provides that "[s]ubject to the approval of the city commission, the board **[Civil Service Board] shall adopt, amend, and enforce a code of rules and regulations which shall have the force and effect of law providing for the appointment and employment in all positions in the classified service,** based on merit, efficiency, character, and industry;" "shall make investigations concerning the enforcement and effect of this article and of the rules adopted;" and "shall make an annual report to the city commission." (emphasis added). These provisions show that the City Manager and the "city commission" have final policymaking authority over all employment decisions made by municipal officials. The procedure for a

civil service employee to seek review by the City Manager of an adverse employment decision is to request a hearing by the Civil Service Board, which conducts a hearing and makes findings and recommendations to the Manager.

The City ordinances provide the Chief of Police with immediate direction and control of the police force. Moreover, the "Departmental Orders," which are the Rules and Regulations of the City of Miami Police Department, provide him with final departmental decisionmaking authority with respect to all personnel decisions, thereby insulating the Chief of Police from further **departmental** review. The City has established a Civil Service Board and empowered it to review improper personnel actions taken at the department level and report them to the City Manager for a final decision.

Pino argues that the Chief of Police is insulated from review with respect to intra departmental transfers because there is no provision in the City ordinances, Code or the Departmental Orders, for review of this particular type of action. This argument is not supported by the relevant laws, rules and regulations. Neither Pino nor the City argues that an intra departmental transfer is a "disciplinary" action. Admittedly, therefore, Pino's transfer, which was without "discipline," and "without time loss or a change in employment status [suspension not in excess of two tours of duty, demotion or dismissal]," was not subject to review by the DDRB. However, there is nothing in the record to indicate that an improper intra departmental transfer without "discipline" is not subject to review by the Civil Service Board.

The scope of Civil Service Board review is broader than review by DDRB, according to relevant provisions. Although the Civil Service Board, like the DDRB, is empowered to hear disciplinary grievances, *i.e.*, grievances filed by classified civil service employees that are "removed, suspended, fined, laid off, or demoted" or "reduced in grade" under Section 36(f) of the Charter and Sections 40–122 and 42–70 of the Code, the Civil Service Board is given additional powers in Section 40.128 of the Code. Section 40.128(a) provides that the Board may conduct an investigation whenever it believes that an **"abuse of power"** has occurred with respect to the employment of a civil service employee. Specifically, the Board has a duty to investigate abuses of power "in recommending or making an appointment to any position, or in a layoff, demotion, suspension, or removal without justification, **or in any other manner.**" (emphasis added). This language is broad enough to include an abuse of power with respect to **any** employment action, not just the specific ones mentioned.

Certainly, an allegation that an adverse employment decision was taken in retaliation for whistle-blowing, and specifically in the present case for an employee's disclosure of information regarding potentially criminal conduct by a Major in the City's police force, qualifies as an "abuse of power." Pino is not simply questioning his superiors' exercise of judgment in transferring him despite his fitness for the position; he is claiming intentional wrongful conduct in the form of retaliation. He alleges violation of a federal statute that prohibits municipal employers from retaliating against employees who engage in constitutionally protected speech, and a state law that prohibits municipal employers from retaliating against whistle-blowers. If the Board finds such an abuse of power under Section 40.128(a), the Board makes a report to the director of the department and to the City Manager.

With respect to employees' rights to petition the Civil Service Board for review, Section 40.128(b) provides that "[a]ny employee who is aggrieved by reason of what

he/she considers a violation of this article to his/her detriment, or who has a grievance concerning his/her employment under this article, and who desires redress, shall notify the executive secretary in writing, stating the nature of his/her grievance and requesting a hearing by the board." The language employed here is also broad. Essentially, an employee has the right to bring directly to the Civil Service Board (and not through the DDRB first) any grievance that he or she subjectively believes is adverse and unwarranted by considerations of efficiency, character, fitness and the other enumerated legitimate reasons for an employment decision under the City's and the Police Department's Rules and Regulations.

An employee is also permitted, under the second phrase of subsection (b), to bring any grievance concerning his or her "employment under this article." The phrase "employment under this article" refers to the aggrieved person's employment in the civil service, and not to a particular kind of grievance brought under the article. Indeed, the title of Section 40.128 is **"grievances and abuses generally."** Once again, under subsection (b), the Civil Service Board presents its findings and recommendations to the City Manager for his or her imposition of a proper remedy. Although there is no evidence in the record that the Board has actually heard transfer grievances, there is also no evidence that it has not, and the language is broad enough to permit the Board to provide review of these actions, especially where there are allegations of retaliation.

Thus, under the system of governance enacted in the City Code and Charter, Pino, as an employee of the classified civil service, had the right to seek review of a grievance that he considered to be an "abuse of power" by the Civil Service Board under Section 40.128(b) of the Code. The City Manager could then have provided Pino with an administrative remedy, such as reinstating Pino to his prior position, after receiving findings and recommendations from the Board.

Another argument raised by Pino is that the "catch-all" provisions in the Code and Charter indicating that the City Manager has supervision and control of the Chief of Police "in all matters" are contradicted by, or at least that an ambiguity is raised by, several Departmental Orders by which police officers must also abide. No such ambiguity exists. The Departmental Orders and the City Charter and Code can be read to be consistent. First, Pino relies on Departmental Order 1, Chapter 11, Section 11.6.24.1, which provides that members of the police force shall attempt to resolve their grievances internally with their superior officers, shall "pursue the chain of command (up to and including the Chief of Police)," and "shall not discuss their grievances with other departmental members or civilian employees (of equal or lower grade) or with persons outside the Police Department." Pino urges that this regulation somehow prevented him from going to the Civil Service Board.

This is not the case. The regulation simply prevents police officers from talking to persons outside of the department about their grievances, and also requires them to take their grievance up through the Chief of Police before taking any further action. In other words, the departmental directive prevents a police officer from going to the Civil Service Board before having his or her grievance heard by superiors in the department. If he or she were prevented from going to the Civil Service Board after seeking departmental review by the Chief of Police, then the laws creating the Civil Service Board and giving it independent authority to hear grievances would be meaningless because police officers could never exercise their grievance rights.

Pino also relies on Departmental Order 1, Chapter 11, Section 11.4.4.3, which provides the Chief of Police with final departmental action on **all** personnel matters, and Departmental Order 6, Chapter 1, Sections 1.4.21, 1.4.21.1 and 1.4.21.1.3, which establish the departmental transfer policy and procedures, and which also give the Chief discretion to grant or deny transfers in his/her judgment, and subject to no other departmental review. What these regulations show is that the Chief of Police, as the administrative head of the police department, makes final departmental decisions on personnel actions, including intra departmental transfers and/or reassignments. Once again, if his decisions were absolutely final for policy purposes, then the referenced Code and Charter provisions would be meaningless because the Chief of Police would have final authority as to all personnel decisions. The Departmental Orders do not, and cannot, supersede the unambiguous provisions of the Charter and Code that establish a hierarchy of governance giving the City Manager, as the chief operating officer and head of the administrative branch of City government, final policymaking authority. Thus, although the Chief of Police has the authority to make final **managerial decisions** pertaining to personnel decisions, including transfers within the police department, he or she does not possess final authority to establish municipal **policy** with respect to such actions.

Pino does not suggest that the City Manager or the City Commission approved or ratified the decision made by the Chief of Police. Furthermore, Pino admits that he did not seek administrative review by the Civil Service Board of the transfer decision he believes to have been unlawful retaliation. (Pino Depo., 144:18–20). Pino simply "didn't think of it." (*Id.*, 144:20). Pino knew about the Civil Service Board because he had testified before the Board. (*Id.*, 144:21–23). Moreover, Pino never submitted a request for a hearing with respect to his allegation that he was transferred to the midnight patrol shift in retaliation for filing a complaint with the State Attorney against Christmas. (Mindingall Aff., ¶ 7).

It is important to note that Pino, as a police officer in Miami, is required by Departmental Order, Chapter 11, Sections 11.6.29.1 and 11.6.29.3, to have knowledge of, and to adhere to, all City ordinances and regulations, County codes, as well as state and federal statutes, including, of course, all of the provisions previously described. Therefore, he was required to know his grievance rights and not rely on faulty information provided by others.

The record evidence establishes that final policymaking authority with respect to personnel matters lies with the City Manager, not the Chief of Police. The City Manager's authority to supervise and control the Chief of Police in all matters is unqualified. Pino argues that the City Manager's power is qualified in the sense that some matters, like transfers, cannot come to the City Manager's attention under the procedures outlined in the applicable law. For the reasons stated above, that argument is rejected. Section 40.128(b) of the City Code provided a procedure by which Pino could have brought his grievance, through the Civil Service Board, to the City Manager. Because the City Manager, the only City official authorized to make policy on personnel matters, has not ratified the decision to transfer Pino, the City is granted summary judgment as to Count I.

C. *The City is Also Entitled to Summary Judgment as to Count II Because Pino Has Failed to Exhaust His Administrative Remedies By Not Filing a Request for a Hearing Before the Civil Service Board*

The City argues that Pino's claim under the Whistle-blower's Act is also barred

against the City because the record evidence conclusively establishes that Pino did not request a hearing by the City's Civil Service Board to review the actions that Pino alleges constituted retaliation. Thus, the City maintains he is precluded from bringing an action in court for failure to exhaust his administrative remedies.

■ The legal principle that a party must exhaust any administrative remedy available to her or him prior to turning to the courts for relief is applicable to statutory causes of action under the Whistleblower's Act. *See, e.g., McGregor v. Palm Beach County,* 674 F.Supp. 858, 861 (S.D.Fla.1987). The Whistle-blower's Act provides:

> **Within 60 days** after the action prohibited by this section, any **local public employee** protected by this section may **file a complaint with the appropriate local governmental authority,** if that authority has established by ordinance an **administrative procedure for handling such complaints** or has contracted with the Division of Administrative Hearings under s. 120.65(8) to conduct hearings under this section. The administrative procedure created by ordinance must provide for the complaint to be heard by a panel of impartial persons appointed by the appropriate local governmental authority. Within 180 days after entry of a final decision by the local governmental authority, the public employee who filed the complaint may bring a civil action in any court of competent jurisdiction.

FLA. STAT. § 112.3187(8)(b) (emphasis added). The City's Civil Service Board, as set forth in Section 36(a) of the Miami Charter, meets the requirements of § 112.3187(8)(b) because the Board (1) was established by ordinance; (2) is authorized by Section 40–128 of the Code of the City of Miami to hear whistle-blower complaints; (3) is composed of a panel of

impartial persons appointed by the appropriate local governmental authority; (4) considers evidence, and has the power to compel production of documents and to subpoena witnesses; and (5) makes findings of fact and conclusions of law so that a final decision may be made by the local governmental authority (the City Manager).

The case of *City of Miami v. Del Rio,* 723 So.2d 299 (Fla. 3d DCA 1998), is directly on point. Del Rio was a City of Miami police officer who alleged that he took issue with the legality of certain directives from his superiors. He "blew the whistle" on them by disclosing their actions to other agencies, including the State Attorney, and according to his allegations, was retaliated against in various ways for having done so. He filed a complaint against the City for alleged violations of the Whistle-blower's Act. A jury found the City liable, and the City appealed.

■ The Third District Court of Appeal, while not identifying the specific adverse employment actions that were taken against Del Rio, reversed the trial court's judgment, holding that Del Rio failed to exhaust his administrative remedies by abandoning his petition for a hearing by the same Civil Service Board that was available to Pino in this case. The court found that the City's Civil Service Board met the requirements of the Whistle-blower's Act as an appropriate panel from which a City police officer could seek relief for alleged violations of the Act, and thus, Del Rio was required to exhaust his administrative remedies with the Board prior to bringing a civil action in court.

The court interpreted the pertinent Charter and Code provisions and found that the Civil Service Board was established by ordinance, and thus was authorized to handle whistle-blower complaints. The court also indicated that the Civil Service Board was composed of a panel of

impartial persons, and made findings of fact and conclusions of law to the local governmental authority that would make the final decision. The court noted that after several delays ordered by the Board for the purpose of receiving additional information from Del Rio, rather than provide the information, Del Rio abandoned his petition and sought judicial relief. Under those circumstances, the court held that the filing of the civil action was premature and left the employee in the posture where he had not exhausted his remedies. *See Del Rio,* 723 So.2d at 301 (citation omitted); *see also Dinehart v. Town of Palm Beach,* 728 So.2d 360 (Fla. 4th DCA 1999) (public employees are only entitled to bring a civil action under the Whistle-blower's Act without having **first** filed a complaint with the appropriate governmental authority where the local governmental authority has not adopted an administrative procedure).

The proposition that the *Del Rio* case stands for is that **all** whistle-blower complaints brought by civil service employees in the City of Miami may be heard by the Civil Service Board, regardless of the nature of the adverse employment action. The Court has considered *Ujcic v. City of Apopka,* 581 So.2d 218, 219–20 (Fla. 5th DCA 1991), cited by Pino. Like the *Del Rio* court, 723 So.2d at 301, this Court finds that the *Ujcic* case is distinguishable. The particular review board in that case did not meet the requirements of the Whistle-blower's Act because it did not make findings of fact, establish a record, or make recommendations of penalty, all things that the Civil Service Board is specifically directed to do.

Pino also asserts that he did attempt to take the matter to the Board through his union representative, Al Cotera, and was told by Cotera that no administrative appeals were available to him with respect to a transfer decision. Pino's discussion with Cotera pertained to whether or not the transfer was within management rights and subject to the grievance process. By making this inquiry from Cotera, Pino contends that he satisfied his exhaustion requirement. Pino further proposes that the Court consider his act of taking the matter for review to the State Attorney's Office to satisfy the administrative requirement.

Pino concedes, however, that filing a criminal complaint with the State Attorney's Office does not meet the statutory criteria of Section 112.3187. Neither do the conversations that he had with other police officers, including Gonzalez and Cotera. Indeed, even if Pino had been granted a meeting with Martinez, the highest-ranking police officer, as he maintains he requested, this meeting would not have satisfied the exhaustion requirement because it would not have complied with the specific administrative appeal procedures established by the Charter and the Code. Pino's ignorance of his rights, and/or his reliance on erroneous advice, is not material as he is charged with knowledge of the applicable provisions. Accordingly, the City is granted summary judgment as to Count II.

## IV. *CONCLUSION*

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** as follows:

1. Defendant, City of Miami's Motion for Summary Judgment (**D.E. 37 & 38**) is **GRANTED.**

2. Final Judgment will be **ENTERED** in favor of the City of Miami, and against Plaintiff, on Counts I and II of the Amended Complaint by separate order as required by Rule 58, Fed. R. Civ. P..